696 A.2d 77

IN THE MATTER OF REGISTRANT A.I.: APPLICATION
FOR JUDICIAL REVIEW OF NOTIFICATION AND
TIER DESIGNATION.[1]

Superior Court of New Jersey
Appellate Division

Submitted June 18, 1997—Decided July 8, 1997.

---

[1] The initials used in the caption are fictitious. This court has, for the purposes of confidentiality, refrained from identifying the names of those involved as well as the attorneys, Municipality and County in question.

Before Judges SHEBELL and DREIER.

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This is a Megan's Law appeal. Registrant, A.I., was released on parole on September 26, 1994 from the Adult Diagnostic and Treatment Center (ADTC) at Avenel after serving an indeterminate sentence not to exceed twenty years. He had been sentenced on a guilty plea to charges of armed robbery and sodomy that were committed on November 9, 1978. Upon his release from Avenel, he registered with the County Prosecutor's Office pursuant to the Registration and Community Notification Laws (Megan's Law), *N.J.S.A.* 2C:7–1 to –11.

On June 6, 1996, A.I. was notified by the Prosecutor that he was considered a high risk (Tier III) sex offender with a Registrant Risk Assessment Scale (RRAS) score of seventy-seven (77) points. A.I. sought judicial review to contest his tier designation.

On September 5, 1997, a conference was held before a judge, at which time A.I. contested the ratings assigned to the following categories of the RRAS: Victim Selection, History of Antisocial Acts, and Employment. The judge granted A.I.'s request to be evaluated by an expert. In September 1996, the expert issued his report. Hearings were conducted in January 1997, and on February 19, 1997, the judge, after hearing expert testimony, affirmed the Tier III classification. This appeal follows.

In November 1975, A.I. was charged with robbery and assault with intent to commit sodomy of a fifteen year old male. On July

30, 1976, he was sentenced to an indeterminate term at the New Jersey Youth Correction Institution. He was paroled on August 24, 1977. He was re-arrested in November 1978 for sodomy and armed robbery of a sixteen year old male. A.I. stated to the police that he had done this in the past to four other boys. In March 1979, he pled guilty to sodomy, and the armed robbery charge was dismissed. He was sentenced on May 10, 1979 to a twenty year indeterminate sentence at the ADTC at Avenel. He was released on parole from the ADTC on September 26, 1994. A.I. has a juvenile record of three larcenies, as well as an adult disorderly persons offense.

The November 1978 offense occurred as the victim left his girlfriend's house. A.I. pulled up in a car in front of the house and ordered the victim to enter the car. A.I. drove to a secluded area of a park and ordered the victim to step outside. A.I. told the victim that he knew the victim's girlfriend. The victim observed that A.I. possessed a gun and a blood stained hammer. During the assault, A.I. repeatedly slapped the face of the victim and told him that if he yelled, he would kill him. Instilling fear in the victim, A.I. told him that he had taken other kids to the park and killed them. The victim was forced to perform fellatio, was sodomized, and then ordered to perform fellatio again. After ordering the victim to turn over his money, A.I. told the victim he wouldn't need money where he was going. After the victim escaped and ran home, he called his girlfriend to learn the name of A.I. The incident was then reported to the police, and the victim was admitted to the hospital.

Reports from ADTC describe A.I.'s sexual pathology as one of being "exposed to the fusion of sex and violence." The following is a synopsis from a report dated January 18, 1994 explaining his pathological development:

At age 10, [A.I.] was summarily raped by several homosexual men at once. He was forced to fellate one man while another sodomized him simultaneously. Although [A.I.] reports that this assault was painful, he also states that it "felt good". At age 14, [A.I.] and several friends sexually abused a female in a "train". However, [A.I.] could not perform because he feared being sodomized by his friends while on top of

the female. [A.I.] became exclusively attracted to males after the above. He began to fantasize about "plugging" young boys. Consequently, [A.I.] was first sent to jail for attempting to overpower and sodomize young males. During eighteen months of jail, [A.I.] saw many males being raped, which was extremely arousing to him. He admittedly became a "booty bandit". As he states, "It was easier and I didn't have to worry about being rejected or exposed". After release from prison, [A.I.], with the addition of weapons and alcohol, began forcibly raping weaker and younger males. The instant offense was indicative of his mode of operation; which consisted of alcohol and drug use, stalking, the threat of harm and, finally, violent sodomy.

Since his release from ADTC, A.I. has resided with his parents in a two family home. He meets with his parole officer on a monthly basis, which includes home visits by the officer on weekends. He has not had any parole violations since his release and is currently involved in weekly counseling sessions. At the time of the hearing on January 7, 1997, he was employed, although he had held six different jobs since his release.

The psychological expert reported in his evaluation and also testified that A.I. was at a low risk for the commission of further sexual offenses. This conclusion was shared by the therapist who treated A.I. after his initial release from ADTC on parole. A.I.'s current therapist also concluded that he "is not seen as high risk for reoffending at this time."

The psychological expert acknowledged that A.I. will remain attracted to boys, but added that he has recognized and accepted this attraction and has not acted on it in the past eleven years. When asked what type of attitudes might be troubling and indicative of A.I.'s risk of relapse as a sexual offender, the expert listed refusal to go to outpatient therapy; failure to seek employment; refusal to discuss decisions with his therapist; and failure to personally reach out to family and friends. To the best of the expert's knowledge, A.I. had not displayed any of these warning signs.

Upon consideration of all the evidence and testimony offered, the judge was not convinced that two and a half years of positive psychological behavior, when measured against his lifetime of violent sex crimes and incarceration, was sufficient to override the

Tier III, high risk, designation. The judge noted that A.I. is a compulsive and repetitive sex offender with an extremely violent history who has been on parole a relatively short period of time.

A.I. contends the judge erred in classifying him a high risk offender, asserting that his risk assessment score is inaccurate. He further argues that the judge placed excessive reliance on this score, failing to give adequate weight to his positive psychological profile and post-sentence behavior. Specifically, A.I. maintains the scores assigned to category numbers four (victim selection) and eight (history of antisocial acts) are in error. A.I. claims that his tier classification would be modified to Tier II (moderate risk) if the points in either of these categories were lowered.

■ As to victim selection, it is A.I.'s position that he and the victim, C.H., were not strangers but acquaintances. An acquaintance receives a moderate rating. Acquaintance is defined as "a degree of social/business interaction beyond that of a single contact...." *REGISTRANT RISK ASSESSMENT SCALE MANUAL,* revised October 3, 1995, pages 6–7. A.I. argues that he and the victim had social interaction that went beyond that of a single contact.

In the police report concerning his arrest for the November 1978 assault, A.I. told the police that he and the victim were friends before the assault, but that they "never hung out together, [they] just hung out in the same area." He also testified at the hearing that he had a "mediocre" relationship with the victim, who he met through the victim's girlfriend. However, during cross examination, he revealed that he was not the victim's friend, but a friend of the victim's girlfriend. He further testified:

Q. Now, the [victim], you indicated, using your words, you knew him for about six months but again your relationship was with his girlfriend not with him; correct?
A. True.

According to the victim's statement provided in the police report, he did not know A.I.'s name and had to call his girlfriend to obtain it. The victim called his girlfriend because he had seen his attacker with her on previous occasions. The victim also told

the police that on the Tuesday prior to the offense, A.I. punched him while he sat on a wall across the street from his girlfriend's house.

■ Having an awareness of someone in the neighborhood and being physically assaulted by him does not rise to the type of social acquaintance defined in the Risk Assessment Scale Manual. There is no evidence that A.I. and the victim had prior interaction that was consensual or social in nature. Significantly, A.I.'s approach to the violent sexual attack is not the type, involving urging or subterfuge, that an offender would typically take in having a sexual encounter with one with whom he is socially acquainted. The victim was ordered to get in A.I.'s car, where a gun was present, under threat that if he didn't, A.I. would kill him. This approach is clearly predatory and of the dangerous nature that one might use to accost a stranger. A.I. has admitted that he used to think about going to look for kids he didn't know. Unquestionably, the judge's conclusion that "any prior relationship was minimal, trivial and superficial" as to victim selection should not be disturbed.

■ A.I. disputes the score assigned to category number eight, history of antisocial acts. He asserts that the risk assessment for this category should be classified as "limited history" because all criminal offenses, other than the sexual offenses, occurred over twenty years ago when he was still a juvenile. Additionally, he argues that the fact that he had no record of offenses while incarcerated at the ADTC, and has not committed any offenses since being paroled, should be considered in modifying the classification.

A.I. had three prior arrests as a juvenile which led to sustained charges, as well as a disorderly persons arrest as an adult. The high risk classification assessed by the State clearly complies with the Attorney General's *GUIDELINES FOR LAW ENFORCEMENT FOR NOTIFICATION TO LOCAL OFFICIALS AND/OR THE COMMUNITY OF THE ENTRY OF A SEX*

*OFFENDER INTO THE COMMUNITY,* revised June 1, 1996, page 8. We find no error. *R.* 2:11–3(e)(2).

■ Additionally, there is no merit to A.I.'s position that the lack of offenses while incarcerated should be factored into the score. There is no support for this proposition in the Attorney General's Guidelines or the RRAS Manual. Not only did the experts that developed the RRAS fail to find any probative value in A.I.'s proposition for assessing the risk of re-offense, it also runs contrary to common sense. The decreased opportunities the offender would have to recidivate while incarcerated in a highly structured environment such as the ADTC, with continuous therapy, is obvious. Therefore, common sense dictates that the lack of offenses while incarcerated has no bearing on A.I.'s risk of re-offense when released.

A.I. also argues that the judge erroneously placed excessive reliance on the RRAS, failing to give adequate weight to his positive psychological profile and post-sentence behavior. He further argues that the court erred in shifting the burden of proof to him because the State had not established a prima facie case warranting a Tier III designation. In support of this argument, A.I. notes that the Supreme Court has directed the Attorney General to revise the Guidelines "particularly as to the manner in which the Scale considers psychological or psychiatric profiles." *In re G.B.,* 147 *N.J.* 62, 77 n. 4, 685 *A.2d* 1252 (1996). A.I. contends that the State did not satisfy its burden of a prima facie case because it has not modified the Guidelines to consider a registrant's psychological profile. Additionally, A.I. emphasizes that he should be classified a low risk offender because he was released from the ADTC. Relying on *N.J.S.A.* 2C:47–5, he argues that, because he has satisfied the requirements for parole and was released from the ADTC, by definition he should not be classified high risk.

■ A.I.'s contention that he should have been classified a low risk because he was released on parole is without merit. *R.* 2:11–3(e)(2). As noted in *Doe v. Poritz:*

tudies describing recidivism by sex offenders indicate the severity of the problem the Legislature addressed in Megan's Law. Studies report that rapists recidivate at a rate of 7 to 35%; ... and offenders who molest young boys, at a rate of 13 to 40%. Further, of those who recidivate, many commit their second crime after a *long* interval without offense.

[*Doe v. Poritz*, 142 *N.J.* 1, 15, 662 *A.2d* 367 (1995) (emphasis added).]

To systematically classify any compulsive and repetitive sex offender a low risk because of release from incarceration would render Megan's Law meaningless. *See N.J.S.A.* 2C:7–2.

In *In re G.B., supra,* the court found the RRAS "sufficiently probative and reliable to fulfill the State's burden of presenting a *prima facie* case." 147 *N.J.* at 81, 685 *A.2d* 1252 (citing *In re C.A.,* 146 *N.J.* 71, 107, 679 *A.2d* 1153 (1996)). "Thus, the Scale is presumptively accurate and is to be afforded substantial weight—indeed it will even have binding effect—unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale.'" *Id.* at 81, 679 *A.2d* 1153 (quoting *In re C.A., supra,* 146 *N.J.* at 107, 679 *A.2d* 1153). The Court emphasized that a registrant should no longer argue that the RRAS is presumptively unreliable. *Id.* at 82, 679 *A.2d* 1153. The Court further addressed the RRAS's deficiency in addressing positive psychological profile as follows:

[P]ositive psychiatric or psychological profiles and positive post-sentence behavior can never lower an offender's overall score. Rather, positive numbers attributable to such variable factors serve only to add points, albeit fewer points, to a registrant's score. *See Bench Manual, supra,* at 23–25. Given the Scale's failure to consider positive psychiatric profiles and positive post-sentence behavior as true mitigating factors that can reduce the projected risk of reoffense, expert testimony *may* be essential for an accurate tier designation, even to the point of overriding the Scale score.

[*Id.* at 83, 679 *A.2d* 1153 (emphasis added).]

Here, the judge thoroughly reviewed all the documentary evidence and heard testimony from the experts relative to A.I.'s positive psychological profile and post-sentence behavior. The judge reasonably and soundly concluded that A.I.'s risk assessment score of seventy-seven points was a true reflection of the risk presented by A.I., thereby affirming the Tier III classifica-

tion. The judge was not persuaded by a preponderance of the evidence that A.I. was not a high risk offender.

■  Although there was a significant amount of expert testimony presented suggesting a lower tier rating, the purpose of expert testimony is to assist, not bind, the factfinder. *See State v. Odom*, 116 *N.J.* 65, 560 *A.*2d 1198 (1989); *State v. R.W.*, 104 *N.J.* 14, 514 *A.*2d 1287 (1986); *State v. Kelly*, 97 *N.J.* 178, 478 *A.*2d 364 (1984). In *In re G.B., supra*, our Supreme Court addressed the trial court's use of expert testimony warning:

> 'The final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. The ultimate decision on dangerousness is, therefore, a legal one, not a medical one, even though it is guided by medical expert testimony.'
>
> [147 *N.J.* at 86, 685 *A.*2d 1252 (quoting *In re D.C.*, 146 *N.J.* 31, 59, 679 *A.*2d 634 (1996)).]

Before his release from the ADTC, A.I. had been incarcerated for his entire adult life with the exception of a brief period of parole after being released for his first sexual offense. Despite his encouraging progress, he remains attracted sexually to boys. Although A.I. lives with his parents, he lived with his family when he committed juvenile theft offenses, drug and disorderly persons offenses, robbery, assault with intent to rape, and the violent offense of sodomy. We find no basis to conclude that there was an abuse of discretion or that the judge's analysis was arbitrary. Therefore, the high risk designation assigned to A.I. is affirmed.