**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4807-17T1
A-5512-18T1

IN THE MATTER OF
REGISTRANT J.G.

_____

IN THE MATTER OF
REGISTRANT C.C.

_____

> **APPROVED FOR PUBLICATION**
>
> **April 13, 2020**
>
> **APPELLATE DIVISION**

Argued January 22, 2020 – Decided April 13, 2020

Before Judges Accurso, Gilson and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. ML-17-13-0023 and Camden County, Docket No. ML-18-04-0057.

Glenn D. Kassman, Designated Counsel, argued the cause for appellant J.G. (Joseph E. Krakora, Public Defender, attorney; Glenn D. Kassman, of counsel and on the brief).

Ellyn Rebecca Rajfer, Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-4807-17 (Christopher Gramiccioni, Monmouth County Prosecutor, attorney; Ellyn Rebecca Rajfer, of counsel and on the brief).

Jesse M. De Brosse, Assistant Deputy Public Defender, argued the cause for amicus curiae New Jersey Office of the Public Defender in A-4807-17 (Joseph E.

Krakora, Public Defender, attorney; Jesse M. DeBrosse on the brief).

Jesse M. De Brosse, Assistant Deputy Public Defender, argued the cause for appellant C.C. (Joseph E. Krakora, Public Defender, attorney; Jesse M. De Brosse, of counsel and on the brief).

Matthew Thomas Spence, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-5512-18 (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Matthew Thomas Spence, of counsel on the brief).

The opinion of the court was delivered by

GILSON, J.A.D.

These two appeals raise challenges to the use of the Registrant Risk Assessment Scale (RRAS) to determine the risk of re-offense by persons who have been convicted of possessing or distributing child pornography. Defendants both pled guilty to second-degree endangering the welfare of a child by distributing child pornography in violation of N.J.S.A. 2C:24-4(b)(5)(a)(iii). Following the completion of their custodial sentences, they were both found to pose a moderate risk of re-offense and were designated as Tier Two registrants under the Registration and Community Notification Laws, N.J.S.A. 2C:7-1 to -23, commonly known as Megan's Law.

Defendants appeal from the orders imposing that level of classification, contending that, as applied to them, the use of the RRAS was improper. They also argue that the use of the RRAS in tiering sex offenders who have been convicted of one offense related to possessing or distributing child pornography gives a skewed tiering result. Thus, defendants argue that the RRAS should be modified, replaced, or not used in tiering one-time child pornography offenders.

We conclude that neither defendant created the record to support his arguments. Accordingly, we affirm and issue this consolidated opinion to address the common arguments presented by defendants.

I.

To put defendants' challenges in context, we summarize the facts giving rise to their convictions. We also summarize the procedural history concerning their Megan's Law classifications.

Defendant J.G.

In 2015, law enforcement personnel obtained and executed a warrant to search for an electronic device used to share a video of child pornography. J.G.'s computer was seized. He later admitted that he had downloaded child

3

pornography images and videos to his computer and had shared at least one video depicting child pornography on an internet video chat site.

A forensic examination of J.G.'s computer revealed that it contained at least six images and twenty-three videos of child pornography. J.G.'s computer also contained another seventeen videos with names suggesting they depicted child pornography. Some of the child pornography had been stored on J.G.'s computer for approximately three years.

J.G. was charged with two counts of possessing child pornography and one count of distributing child pornography. In January 2016, he pled guilty to second-degree endangering the welfare of a child by distributing child pornography. In accordance with his plea agreement, J.G. was sentenced in the third-degree range to three years in prison. He was also sentenced to the registration and reporting requirements under Megan's Law.

After J.G. was released from prison, the State determined that he posed a moderate risk of re-offense based on a score of forty-six points on the RRAS. Thus, the State notified J.G. that he would be classified as a Tier Two offender, which required community and internet notification. J.G. objected, and the trial court conducted a hearing.

 A-4807-17T1

At J.G.'s classification hearing, the State submitted the RRAS and supporting information. J.G. disputed certain of the scores, and in particular, the scores on factors three (age of victim), four (victim selection), and five (number of offenses or victims). To support his position, J.G. called Dr. Philip Witt, a psychologist, as an expert witness.

Dr. Witt was qualified as an expert in the evaluation, treatment, and risk assessment of sex offenders. He explained that he met with and evaluated J.G. using the Child Pornography Offender Risk Tool (CPORT) and the Sexual Violence Risk-20 (SVR-20). He opined that J.G. posed a low risk of re-offending because he had only one conviction of distributing child pornography and did not have a history of anti-social behavior or convictions involving physical contact with victims.

To put his opinions in context, Dr. Witt explained that he had served on the Attorney General's task force that developed the RRAS. Dr. Witt testified that when the RRAS was developed in 1995, child pornography had not been considered. Focusing on factors three, four, and five of the RRAS, Dr. Witt opined that those factors were inaccurate in assessing the risk of one-time child pornography offenders. Thus, he offered three options: (1) not use the RRAS

A-4807-17T1

for such offenders and use a different instrument; (2) use the RRAS, but not score factors three, four, and five; or (3) use the RRAS, but create an exception allowing courts to classify one-time child pornography offenders as Tier One offenders.

On cross examination, Dr. Witt acknowledged the CPORT had not been validated as an instrument for assessing the risk of re-offense and that the study underlying CPORT had limits. In that regard, Dr. Witt acknowledged that none of the eighty men involved in the CPORT study had prior child pornography convictions and, therefore, the study was biased towards lower-risk offenders.

After hearing the testimony of Dr. Witt, and considering the submissions and arguments of counsel, the trial court found the State had presented clear and convincing evidence that J.G. posed a moderate risk of re-offense. The court read its findings of fact and conclusions of law into the record on June 20, 2018.

The court first considered J.G.'s specific objections to the scoring of factors three, four, five, and six of the RRAS. The court rejected Dr. Witt's opinion that J.G. posed a low risk of re-offending because the court found that Dr. Witt had not thoroughly checked J.G.'s self-reporting and the state had shown that J.G. misreported and minimized his behavior. Accordingly, the court

6

accepted the State's score of forty-six on the RRAS and ruled that it was appropriate to put J.G. in Tier Two, warranting community notification.

The court also considered, but rejected, Dr. Witt's opinion that factors three, four, and five of the RRAS should not be used in scoring one-time child pornography offenders. The court also found that CPORT was not an appropriate alternative tool since it had not been validated as an actuarial instrument. In addition, the court rejected Dr. Witt's argument that because child pornography was not considered in developing the RRAS, that scale was not appropriate for child pornography offenders.

Defendant C.C.

C.C. was identified as someone downloading and distributing child pornography through a peer-to-peer network. Such networks allow users to download content from other users' collections. In 2016, a number of electronic devices were seized from C.C.'s home in accordance with a warrant. An examination of those devices revealed that they contained approximately 40,000 images and videos of child pornography. The children depicted in those images and videos ranged in age from nine to fifteen years old. Some of those images had been downloaded in 2000, more than fifteen years earlier.

7

C.C. admitted he used peer-to-peer programs and had used his laptop computer to download pornography. He was charged with four counts of endangering the welfare of children by possessing and distributing child pornography. In 2017, C.C. pled guilty to one count of second-degree endangering the welfare of a child by distributing child pornography. He was sentenced to five years in prison, parole supervision for life, and registration and reporting requirements under Megan's Law.

Following his parole in May 2018, the State determined that C.C. posed a moderate risk of re-offense based on a score of fifty-nine points on the RRAS. Accordingly, the State notified C.C. that he would be classified as a Tier Two offender, which required community and internet notification.

C.C. objected, and the trial court conducted a classification hearing on April 4, 2019. At the hearing, the State presented the RRAS and supporting information. The State and C.C. agreed to lower the scoring on factors seven (length of time since last offense) and thirteen (employment stability). They disputed the scoring of factors three, four, and five. The State sought high risk scores on each of those factors. In contrast, C.C. argued for low risk scores, that

8

is, a zero on each of those factors. To support his position, C.C. called Dr. Witt as an expert.

Dr. Witt testified that he met with C.C. and conducted evaluations using CPORT and SVR-20. Dr. Witt explained that he had served on the Attorney General's task force that developed the RRAS and a 2005 task force that developed the Juvenile Risk Assessment Scale (JRAS), the juvenile counterpart to the RRAS. Dr. Witt again testified that when the RRAS was developed, child pornography had not been considered. He contended the JRAS considered child pornography but did not score victim characteristics in pornography-only cases if the offender had not committed a physical offense against the children depicted in the images. Dr. Witt then recommended that the rules for scoring factors three, four, and five on the JRAS should also apply to the RRAS.

The trial court did not accept Dr. Witt's opinions. The court declined to apply the JRAS in scoring factors under the RRAS, reasoning that juveniles are treated differently from adults for good reason. The court went on to accept the high risk scoring on factors three, four, and five as submitted by the State under the RRAS. The court found there was clear and convincing evidence that certain victims were below the age of thirteen, the victims were strangers to C.C., and

there were over 40,000 victims.  Consequently, on April 4, 2019, the court entered an order classifying C.C. as a Tier Two registrant under Megan's Law.

C.C. filed a motion for reconsideration.  As part of that motion, C.C. submitted certifications from Dr. Jackson T. Bosley and Dr. Sean Hiscox, two psychologists who also served on the committee for the JRAS.  On July 11, 2019, the court entered an order denying C.C.'s motion for reconsideration.

## II.

On these appeals, J.G. and C.C. both challenge the use of the RRAS in determining their risk of re-offending under Megan's Law.  They contend that offenders, such as themselves, who have been convicted of only one offense of possessing or distributing child pornography, should be scored differently from sex offenders with a history of physical contact with their victims.  Accordingly, defendants argue that factors three, four, and five of the RRAS should be scored as low risk or should be replaced with the JRAS scoring guidelines.  Alternatively, defendants argue that a new scale should be developed because child pornography was not considered when the RRAS was developed and factors three, four, and five of the RRAS systematically overstate the risk of re-offense.

10

The primary issue presented by these appeals is whether the RRAS is an appropriate tool to help assess the risk of re-offense for sex offenders who are convicted of one offense for possession or distribution of child pornography. We hold that it is. To put that issue in context, we first summarize the history of Megan's Law and the cases evaluating Megan's Law. Next, we analyze whether defendants have presented records that support a re-evaluation of the RRAS scale.

A.    Megan's Law

Megan's Law was enacted "to protect the community from the dangers of recidivism by sexual offenders." In re C.A., 146 N.J. 71, 80 (1996) (citing Doe v. Poritz, 142 N.J. 1, 12-20 (1995)); N.J.S.A. 2C:7-2(a). The statute requires certain sex offenders to register with law enforcement agencies. N.J.S.A. 2C:7-2 to -4. Law enforcement agencies are then required "to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection." N.J.S.A. 2C:7-5(a); In re N.B., 222 N.J. 87, 95 (2015).

Megan's Law identifies three levels of community notification depending upon the degree of the risk of re-offense. N.J.S.A. 2C:7-8(a). If the risk of re-

offense is low, law enforcement agencies likely to encounter the registrant are notified. N.J.S.A. 2C:7-8(c)(1). If the risk of re-offense is moderate, organizations in the community are also notified. N.J.S.A. 2C:7-8(c)(2). If the risk of re-offense is high, notification is also given to members of the public who are likely to encounter the registrant. N.J.S.A. 2C:7-8(c)(3); In re N.B., 222 N.J. at 95.[1]

In Megan's Law, the Legislature required the Attorney General, in consultation with an advisory council, to "promulgate guidelines and procedures for the notification required" by the Act. N.J.S.A. 2C:7-8(a). The guidelines were required to identify factors relevant to the risk of re-offense and the Legislature instructed the Attorney General to consider at least eight factors and, if appropriate, to develop other factors. N.J.S.A. 2C:7-8(b).

As instructed, the Attorney General "convened a committee composed of mental health experts[,] as well as members of the Law Enforcement Committee, which drafted the [RRAS] and the accompanying Registrant Risk Assessment

---

[1] Following a 2000 constitutional amendment, Megan's Law was amended in 2001 to make information in the State's registry about certain sex offenders publicly available on the internet. L. 2001, c. 167 (codified as N.J.S.A. 2C:7-13).

Manual (RRA Manual), which explains the [RRAS]." In re C.A., 146 N.J. at 82. The RRAS identified thirteen factors and assigned them to four categories: seriousness of offense, offense history, characteristics of offender, and community support. Ibid. The RRAS gives greater weight to the first two categories. Registrants are assigned scores for each factor and the factors are then adjusted by multipliers. If the score is thirty-six or below, the registrant is assigned to Tier One. If the score is between thirty-seven and seventy-three, the registrant is assigned to Tier Two. And if the score is seventy-four or above (the maximum score is 111), the registrant is assigned to Tier Three. Ibid.; In re V.L., 441 N.J. Super. 425, 428-29 (App. Div. 2015).

The Supreme Court has held that the registration and community notification components of Megan's Law are constitutional and enforceable. Doe, 142 N.J. at 28; In re M.F., 169 N.J. 45, 52-53 (2001). The Court also has upheld the use of the RRAS in classifying registrants. In re C.A., 146 N.J. at 108-09. Moreover, the Court has repeatedly ruled that the RRAS is entitled to deference. Ibid.; In re G.B., 147 N.J. 62, 81-83 (1996); In re N.B., 222 N.J. at 95 n.3.

The RRAS, however, is not immune to specific challenges as applied to a particular registrant. In re G.B., 147 N.J. at 83-84. To protect the registrant's liberty and privacy interests, the Court has held that a registrant is entitled, if requested, to a judicial hearing to challenge his or her tiering. Doe, 142 N.J. at 30; In re G.B., 147 N.J. at 79. At that hearing, the State has the initial burden of proof and can rely on the RRAS. In that regard, our Supreme Court has explained that the RRAS is a "tool." In re G.B., 147 N.J. at 78. Accordingly, the RRAS is "a useful guide to determine the amount of notification [the] community should receive." Id. at 69. Nevertheless, "[t]he responsibility for ultimately determining the proper scope of notification is left to the trial court after a hearing on the matter." Ibid. (citing In re C.A., 146 N.J. at 83). Furthermore, the judicial determination regarding the tiering classification and community notification "must be [made] by clear and convincing evidence." In re A.A., 461 N.J. Super. 385, 401 (App. Div. 2019) (alteration in original) (quoting G.H. v. Twp. of Galloway, 401 N.J. Super. 392, 403 (App. Div. 2008)).

In explaining the use of the RRAS, our Supreme Court has stated:

> Even though "the [RRAS] provides a useful guide for the prosecutors and court to evaluate risk of re-offense," the court must still make "a value judgment" in determining the proper tier classification and scope

of community notification. Thus, courts are not "to blindly follow the numerical calculation provided by the [RRAS], but rather to enter the appropriate tier classification" based on all of the evidence available to them. The determination of tier classification and scope of notification "are best made on a case-by-case basis within the discretion of the court."

[In re G.B., 147 N.J. at 78-79 (citations omitted) (quoting In re C.A., 146 N.J. at 108-09).]

In challenging a tier determination, a registrant may argue that (1) the RRAS score was erroneously calculated, (2) the case falls outside the "heartland" of Megan's Law cases, or (3) the extent of community notification required is excessive due to "unique" aspects of the registrant's case. In re T.T., 188 N.J. 321, 330 (2006) (quoting In re G.B., 147 N.J. at 85). The Court has also ruled that in limited circumstances, a registrant can call an expert to "establish the existence of unique aspects of a registrant's offense or character that render the [RRAS] score suspect." In re G.B., 147 N.J. at 69. Accordingly, our Supreme Court has explained that if the expert testimony is believed, "such evidence would lead to the conclusions that the [RRAS] does not adequately represent the risk of recidivism for that particular registrant and that, therefore, in such circumstances the scope of notification should be more limited than that

indicated by the registrant's [RRAS] score and attendant tier classification." Ibid. The Court noted that such challenges will be rare. Id. at 82.

The Court has also made clear, however, that registrants cannot argue that the RRAS as a scale is unreliable. Ibid. Instead, the Court has repeatedly held that the RRAS "is presumptively reliable." Ibid.; In re N.B., 222 N.J. at 95 n.3. Thus, the Court has explained:

> [The RRAS] is presumptively accurate and is to be afforded substantial weight – indeed it will even have binding effect – unless and until a registrant "presents subjective criteria that would support a court not relying on the tier classification recommended by the [RRAS]."
>
> . . . .
>
> Challenges to the [RRAS] itself, or challenges to the weight afforded to any of the individual factors that comprise the [RRAS], are not permitted. Instead, all challenges must relate to the characteristics of the individual registrant and the shortcomings of the [RRAS] in his particular case.
>
> [In re G.B., 147 N.J. at 81, 85 (quoting In re C.A., 146 N.J. at 109).]

B. The evidence presented by J.G. and C.C.

Under existing case law, a registrant can challenge his or her individual classification, but cannot challenge the RRAS itself. Id. at 85. Nevertheless,

16

we do not read In re G.B. or its progeny as forever precluding a challenge to the RRAS provided the challenge is based on empirical studies or data developed since 1996. Moreover, the studies or data would need to be sufficiently reliable such that others within the community of professionals evaluating, treating, and assessing the risk of re-offense by sex offenders would rely on those studies or data. In re Accutane Litigation, 234 N.J. 340, 399-400 (2018).

Accordingly, we analyze the challenges presented by J.G. and C.C. on two levels: (1) the RRAS as applied to them; and (2) the RRAS itself. Neither J.G. nor C.C. presented credible evidence to show that the RRAS as applied to them was improper. They also both failed to present any studies or data that call into question the continued validity of the RRAS as applied to one-time child pornography offenders.

1. The As-Applied Challenges

As already summarized, both J.G. and C.C. rely on the testimony of Dr. Witt in presenting their as-applied challenges. Dr. Witt evaluated both J.G. and C.C., reviewed materials related to both offenders, and opined that they presented a low risk of re-offending. In offering that opinion, Dr. Witt relied primarily on the self-reports provided by J.G. and C.C. Both trial courts found

that J.G.'s and C.C.'s self-reporting was incomplete and minimized their past behavior. Moreover, both trial courts rejected as unreliable Dr. Witt's testimony and opinions concerning the low risk presented by J.G. and C.C.

The trial courts' findings in that regard are supported by evidence in the record and we discern no basis for disturbing those factual findings. See In re A.R., 234 N.J. 82, 104 (2018) (holding that there is no abuse of discretion when a trial court's factual findings are supported by "sufficient credible evidence in the record"); In re A.I., 303 N.J. Super. 105, 114 (App. Div. 1997) (holding that appellate courts review tiering determinations for abuse of discretion). Without Dr. Witt's testimony, neither J.G. nor C.C. has established a factual basis to challenge the scoring of the RRAS as applied to them.

Just as importantly, the trial courts found that there was clear and convincing evidence that J.G. and C.C. posed moderate risks of sexual re-offending. J.G. had possessed at least six images and twenty-three videos of child pornography. Moreover, he possessed some of that child pornography for more than three years. C.C. had possessed approximately 40,000 images and videos of child pornography, and he possessed some of that material for more than fifteen years. Consequently, there was clear and convincing evidence that

18

both J.G. and C.C. victimized children under the ages of thirteen, those children were strangers, and there were numerous victims. Indeed, both J.G. and C.C. distributed child pornography thereby continuing the revictimization of the children depicted in those videos. See In re Cohen, 220 N.J. 7, 12 (2014) (noting that "[c]hild pornography, in particular, revictimizes the children involved with each viewing of the same image or video").

2. The RRAS Itself

J.G. and C.C. again rely on Dr. Witt to challenge the RRAS itself. Dr. Witt pointed out that the committee that developed the RRAS did not expressly consider child pornography, and in particular the effects of the internet on child pornography. Accordingly, Dr. Witt offered three options: (1) not use the RRAS for one-time child pornography offenders and use a different "instrument"; (2) use the RRAS but not score factors three, four, and five; or (3) use the RRAS but create an exception that allows trial courts to classify child pornography-only offenders as Tier One offenders. Moreover, C.C. argues that factors three, four, and five of the RRAS should be scored as low risk (that is, zero) "as a matter of law."

19

The flaw in these arguments is that neither J.G. nor C.C. presented any new, validated empirical studies or data supporting their positions. Dr. Witt suggested either using CPORT in place of the RRAS or using the JRAS as a modification to the RRAS. Dr. Witt acknowledged, however, that CPORT had not been validated as an instrument for assessing the risk of re-offense and that the study underlying CPORT had limits. Dr. Witt also acknowledged that the JRAS was developed for juveniles. Data and studies demonstrate that juveniles behave differently, and in particular, more impulsively, than adults. See In Re C.K., 233 N.J. 44, 51 (2018) (holding that juvenile sex offenders "are more likely to act impulsively" than adult sex offenders). Indeed, our Supreme Court has recognized that juveniles act differently from adults and therefore, in appropriate circumstances, warrant different treatment. See State v. Zuber, 227 N.J. 422, 445-46 (2017) (quoting Miller v. Alabama, 567 U.S. 460, 480 (2012)) (recognizing "children are different, and . . . those differences counsel against irrevocably sentencing them to a lifetime in prison"). We agree with both trial courts that Dr. Witt did not present sufficient studies or data to support modifying or replacing the RRAS with CPORT or the JRAS.

A-4807-17T1

Without an alternative instrument, or new study or empirical data, J.G. and C.C. rely on the assertion that child pornography was not expressly considered when the RRAS was developed. That argument is an insufficient basis for rejecting the use of the RRAS.

The RRAS was developed in 1995 by the Attorney General with the assistance of mental health experts. Child pornography clearly existed in 1995. As developed, the scale was to be applied to various sex offenders. Even if every type of offender were not expressly considered, that omission does not mean that the RRAS is automatically inapplicable to a particular type of offender, such as a one-time child pornography offender. In other words, although the developers of the RRAS did not expressly consider child pornography, that omission is not evidence that the RRAS should not be applied to a registrant convicted of a child pornography offense. Instead, there must be evidence that experts in the area of assessing the risk of re-offense of sex offenders generally agree that one-time child pornography offenders are different, and should be evaluated differently, from other sex offenders. Neither J.G. nor C.C. presented such evidence. Moreover, neither J.G. nor C.C. presented evidence demonstrating that the Attorney General has been requested

21

to reevaluate the efficacy of the RRAS for tiering child pornography offenders under Megan's Law.

In summary, we discern no basis to reject the trial courts' findings that J.G. and C.C. both failed to present evidence demonstrating that as applied to them the use of the RRAS was improper. We also hold that neither J.G. nor C.C. presented evidence that warranted a rejection of, or modification to, the RRAS when applied to one-time child pornography offenders. Finally, we do not preclude the possibility that a registrant could develop the record to challenge the RRAS when it is applied to a one-time child pornography offender. That record, however, was not presented by either J.G. or C.C.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22