**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1008-22

IN THE MATTER OF
REGISTRANT M.L.[1]

_____

> **APPROVED FOR PUBLICATION**
>
> **August 16, 2024**
>
> **APPELLATE DIVISION**

Argued February 13, 2024[2] – Decided August 16, 2024

Before Judges Gooden Brown,[3] Natali and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. ML-22-03-0038.

Fletcher C. Duddy, Assistant Public Defender, argued the cause for appellant M.L. (Jennifer Nicole Sellitti, Public Defender, attorney; Fletcher C. Duddy, of counsel and on the briefs; Christina John, Assistant Deputy Public Defender, on the briefs).

Tara Carlin, Assistant Prosecutor, argued the cause for respondent State of New Jersey (LaChia L. Bradshaw, Burlington County Prosecutor, attorney; Tara Carlin, of counsel and on the briefs).

---

[1] We use initials to protect the confidentiality of the proceedings in accordance with Rule 1:38-3(c)(11).

[2] On February 22, 2024, we granted M.L.'s motion for a stay pending the Law Division's resolution of his subsequent motion to reclassify. On April 18, 2024, we received supplemental briefings in which the parties advised us the outcome of that motion did not resolve the issues raised in this appeal.

[3] Judge Gooden Brown did not participate in oral argument but joins the decision with counsel's consent. R. 2:13-2(b).

The opinion of the court was delivered by

PUGLISI, J.S.C. (temporarily assigned).

In this appeal, as a matter of first impression, we consider whether the State may move to expand the scope of notification under Megan's Law, N.J.S.A. 2C:7-1 to -23, based on an increased risk of harm to the community not otherwise accounted for in the Registrant Risk Assessment Scale (Scale).

I.

Megan's Law is intended "to protect the community from the dangers of recidivism by sexual offenders." In re Registrant C.A., 146 N.J. 71, 80 (1996) (citing N.J.S.A. 2C:7-1(a)). To that end, it requires certain sex offenders to register with law enforcement agencies, N.J.S.A. 2C:7-2 to -4, which are then authorized "to release relevant and necessary information regarding sex offenders to the public when the release of the information is necessary for public protection," in accordance with the AG Guidelines.[4] In re Registrant N.B., 222 N.J. 87, 95 (2015) (quoting N.J.S.A. 2C:7-5(a)), citing N.J.S.A. 2C:7-8(a).

_____

[4] Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws (rev. Feb. 2007).

The scope of community notification is primarily determined by a registrant's designation as a Tier I, II or III offender. N.J.S.A. 2C:7-8(a), (c)(1) to (3). A registrant's tier designation indicates the risk of re-offense, as determined by the consideration of thirteen factors or criteria in the Scale, which are weighted and totaled. In re Registrant J.G., 463 N.J. Super. 263, 273-74 (App. Div. 2020).

Offenders who score between zero and thirty-six points are deemed Tier I (low risk), and only "law enforcement agencies likely to encounter" the registrant are notified. N.J.S.A. 2C:7-8(c)(1). Offenders who score between thirty-seven and seventy-three points are deemed Tier II (moderate risk) and, in addition to Tier I notification, schools and organizations in the community are also notified. N.J.S.A. 2C:7-8(c)(2). Offenders who score seventy-four points or higher are deemed Tier III (high risk) and, in addition to Tier I and II notification, "members of the public who are likely to encounter" the registrant are also notified. N.J.S.A. 2C:7-8(c)(3). Depending on tier designation and other statutory requirements, offenders are also subject to inclusion on the internet registry. N.J.S.A. 2C:7-13.

A registrant's due process is satisfied by way of a tiering hearing, during which the State must demonstrate by clear and convincing evidence both the

registrant's level of risk to the community and the scope of notification necessary to protect the community. In re Registrant R.F., 317 N.J. Super. 379, 383-84 (App. Div. 1998). Although it is not scientific evidence, the Scale is a "reliable and useful tool that the State can use to establish its prima facie case concerning a registrant's tier classification and manner of notification." In re Registrant C.A., 146 N.J. at 110. While a tier classification made on the basis of the Scale score should be afforded deference, it is not absolute; a Megan's Law judge must conduct an independent review of the merits of the case and not rely solely on the Scale score. Id. at 108-09.

Our Supreme Court has permitted limited challenges to a registrant's Scale score:

> In most cases, we expect that the tier classification suggested by the Scale will be the same classification recommended by the prosecutor and approved by the court. However, there may be cases in which the registrant presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale. In those cases, we do not expect the court to blindly follow the numerical calculation provided by the Scale, but rather to enter the appropriate tier classification. We recognize that subjective accomplishments, such as an individual registrant's positive response to treatment, may warrant a lower classification than the Scale recommends. However, we believe that those determinations are best made on a case-by-case basis within the discretion of the court.

4

[Id. at 109].

In In re Registrant G.B., 147 N.J. 62, 69 (1996), our Supreme Court again acknowledged the Scale is not immune from challenge. "The Scale is only a tool, albeit a useful one. It does not graduate to an irrebuttable presumption simply because it is properly and accurately computed." Id. at 80-81. There, the Court identified three types of challenges a registrant may lodge:

> First, a registrant may introduce evidence that the calculation that led to the Scale score was incorrectly performed either because of a factual error, because the registrant disputes a prior offense, because the variable factors were improperly determined, or for similar reasons. Second, a registrant may introduce evidence at the hearing that the Scale calculations do not properly encapsulate his specific case; or phrased differently, a registrant may maintain that his case falls outside the "heartland" of cases and, therefore, that he deserves to be placed in a tier other than that called for by the prosecutor's Scale score. Finally, a registrant may introduce evidence that the extent of notification called for by his tier categorization is excessive because of unique aspects of his case.
>
> [Id. at 85].

The Court opined "few cases" would present facts that would undermine the Scale score as calculated for a registrant. Id. at 82. It is "[o]nly in the unusual case where relevant, material, and reliable facts exist for which the Scale does not account, or does not adequately account, should the Scale score

5

be questioned. Those facts must be sufficiently unusual to establish that a particular registrant's case falls outside the 'heartland' of cases." Ibid. The Court provided two examples where a heartland motion may lie: when the registrant's sexual offenses were limited to within the family home, and a "more common" scenario concerning a registrant's psychological state. Id. at 82-83. "In some instances, an expert evaluating a registrant may believe that the registrant's psychological profile makes him substantially less likely to reoffend than the general sex offender." Id. at 83. Because the Scale does not "consider positive psychiatric profiles and positive post-sentence behavior as true mitigating factors that can reduce the projected risk of reoffense, expert testimony may be essential for an accurate tier designation, even to the point of overriding the Scale score." Ibid.

In addition to a heartland motion challenging the Scale score itself, the Court recognized "[a] separate challenge that potentially could be raised to the Scale score concern[ing] the scope of community notification," referring to "a registrant whose Scale score was properly computed and whose case does not fall outside the 'heartland' of cases in terms of his risk of reoffense" but nevertheless "seek[s] to narrow the scope of community notification." Id. at 84. The Court foresaw "few cases in which such a challenge will be successful"

A-1008-22

because "the scope of notification for each tier categorization has been strictly defined by the Attorney General" in the AG Guidelines. Ibid. The Court concluded that "in the unusual case, facts may exist that warrant a narrowing of the notification (or, perhaps, even the expansion of the notification)." Ibid.

M.L. argues the Court's holding in G.B. leads to the ineluctable conclusion that a Megan's Law judge must be bound by the tier designation determined by the Scale unless the registrant, and not the State, presents support to depart from the Scale score; and that only the court, and not the State, may use psychological evidence to justify a departure from the Scale score. We are unpersuaded by this cramped interpretation of Megan's Law and hold that the State may, in certain limited circumstances, request an upward adjustment of notification. Because we are also satisfied that M.L.'s case presented one of those limited circumstances, we affirm.

## II.

On the night of June 26, 1987, then nineteen-year-old M.L., fifteen-year-old R.C. and three other individuals attended a party, where M.L. drank alcohol heavily. They left the party shortly after midnight to go swimming in a wooded area. Upon arrival, M.L. led R.C. into the woods where he sexually assaulted her and then strangled her to death with her bra. He left her body and rejoined

A-1008-22

the rest of the group, telling them R.C. had gone to the bathroom and he could not find her.

After feigning a search for ten minutes, M.L. drove the other individuals home except for A.M., who had passed out in the car. M.L. drove back to the woods, retrieved R.C.'s body and clothing, placed them in the trunk of the car, and continued driving around. When A.M. awoke around 7:00 a.m., M.L. pulled the car into a motel parking lot and showed him R.C.'s body in the trunk. The car did not restart, so the two left it and took public transportation back to their respective homes. That evening, A.M. reported the murder to law enforcement. M.L. hid in the woods for two days until another friend convinced him to turn himself in to the State Police.

M.L. was indicted for two counts of murder (capital offense), N.J.S.A. 2C:11-3(a)(1) and (2) (counts one and two); first-degree murder, N.J.S.A. 2C:11-3(a)(3) (count three); two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3) and (6) (counts four and five); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1) (count six); and fourth-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count seven). On March 22, 1989, a jury found M.L. guilty of all counts.

A-1008-22

At sentencing, counts two and three merged with count one, and count seven merged with count five. M.L. was sentenced to life imprisonment with a thirty-year parole ineligibility period on count one; a consecutive fifteen-year term on count five; and a four-year consecutive term on count six.

M.L. was paroled on April 9, 2021, and moved to Camden County. The State served him with notice of proposed tiering as a Tier II with inclusion on the internet registry, and Tier III community notification. After conducting the tiering hearing on February 10, 2022, the Camden County Megan's Law judge entered an order the next day confirming M.L.'s Scale score of sixty-four, which placed him in Tier II, with inclusion on the internet registry. The judge also granted the State's application for Tier III door-to-door community notification within a 1,000-foot radius of M.L.'s residence. M.L. appealed the order but subsequently withdrew it because he moved from Camden County.

On August 8, 2022, M.L. relocated to and registered in Burlington County. On September 12, 2022, he was again served with notice of proposed tiering as a Tier II with inclusion on the internet registry, and Tier III door-to-door notification within a half-mile radius of his residence.[5]

---

[5] The Tier III notification radius increased based on M.L.'s move to a less densely populated area. See In re Registrant E.A., 285 N.J. Super. 554 (1995).

The Burlington County Megan's Law judge conducted the tiering hearing on November 30, 2022. In considering the State's motion for Tier III notification, the judge expressed doubt that the Scale's consideration of "significant victim harm" encompassed the facts of this case, which had resulted in the "ultimate harm" of R.C.'s death.

The judge then considered three psychological evaluations administered to M.L. The first, dated January 6, 2021, by Richard Mucowski, Ph.D., was an in-depth psychological evaluation prepared for purposes of determining M.L.'s suitability for parole release. Dr. Mucowski noted M.L. admitted he forced himself on R.C. and strangled her because she refused to perform oral sex on him.[6] He expressed concerns about M.L.'s sexual and emotional abuse as a child, substance abuse and prior self-injurious behavior. Dr. Mucowski noted M.L. had not had any treatment for his sex offense or his own sexual abuse. He concluded M.L. presented a medium risk for reoffending if released on parole and recommended "close supervision" if that occurred.

---

[6] Dr. Mucowski noted this statement contradicted M.L.'s prior statement to Dr. Greenberg that he had consensual sex with R.C., during which R.C. said something about his "manhood . . . not being big enough." He told Dr. Greenberg this made him think of his mother, who had made a similar comment to him a few years prior, and "he went into a blind rage and strangled [R.C.]."

The second evaluation, dated September 5, 2022, by Leland D. Mosby, Ed.D., was conducted at the request of the State Parole Board after M.L. had been released on parole, to determine his suitability for future treatment. Dr. Mosby concluded M.L. presented a "higher moderate category for violence and sexual recidivism" and recommended he continue with therapy.

The third evaluation, dated November 1, 2022, by Kenneth L. McNiel, Ph.D., was conducted at M.L.'s request to assess his psychosexual health and risk to the community in connection with the State's application for Tier III notification. Dr. McNiel noted there were "minor discrepancies" in M.L.'s prior accounts of the murder and the "[c]omprehensive risk assessment provide[d] a mixed picture." He found M.L.'s "significant historical risks" were improved or stable and his dynamic risks were minimal based on his positive adjustment in the community, and therefore M.L. presented a low moderate risk of sexual or other violence. He concluded the risk could be "reasonably managed under [parole] supervision, and that a Tier [III] notification including door-to-door notifications would more likely increase the risk of residential and/or employment instability than decrease his overall risk to the community."

In weighing this case, the judge noted the positive aspects of M.L.'s progress, including his adherence to parole conditions, community support,

11

gainful employment and participation in counseling. He also discussed risk factors, including the short time M.L. had been on parole release in the community and the potential for his provocation to anger, particularly with alcohol or drug use.[7]

The judge found that, given the type of harm inflicted, which was "the death of another human being," the risk of harm to the community outweighed M.L.'s privacy interest. On December 2, 2022, the judge entered an order confirming M.L.'s Scale score of fifty-eight,[8] which placed him in Tier II with inclusion on the internet registry, and granted the State's application for Tier III door-to-door notification. On consent of the State, the Tier III notification has been stayed pending the resolution of this appeal.

## III.

We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for

---

[7] The judge also expressed his concerns regarding M.L.'s reconnecting with his mother, given the fact that he identified her as a trigger for his strangling R.C., but noted they "don't talk about the past" and were "living for today, trying to enjoy today and going forward together." Contrary to M.L.'s contention, this concern does not appear to be a primary factor in the judge's decision.

[8] The State consented to a reduction in criteria nine (response to treatment), eleven (therapeutic support) and twelve (residential support).

A-1008-22

an abuse of discretion. See In re Registrant A.I., 303 N.J. Super. 105, 114 (App. Div. 1997). "[A]n abuse of discretion arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotation marks omitted) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). The trial court's findings will be upheld so long as they are supported by sufficient evidence in the record and we find "no basis for disturbing those factual findings." In re Registrant J.G., 463 N.J. Super. at 277. "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We first address whether the State may bring a heartland motion seeking to expand the scope of notification, and note that the record before us is unclear whether M.L. raised this issue before the Megan's Law judge. Ordinarily, we will decline consideration of an issue not properly raised before the trial court, unless the jurisdiction of the court is implicated or the matter concerns an issue of great public importance. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234

13

(1973). Because we recognize the important public safety implications presented by this appeal, we will consider the issue.

Having reviewed precedent concerning heartland applications, we are satisfied the State may, in limited circumstances, request notification more expansive than indicated by a registrant's confirmed Scale score. As with a registrant's heartland application, the State may only request an expansion of notification in the "unusual case where relevant, material, and reliable facts exist for which the Scale does not account, or does not adequately account . . . . Those facts must be sufficiently unusual to establish that a particular registrant's case falls outside the 'heartland' of cases." In re Registrant G.B., 147 N.J. at 82.

We agree this case, which resulted in the "ultimate harm" of death to the victim, presented the facts not taken into account by the Scale. The AG Guidelines define criteria one, degree of force, as "related to the seriousness of the potential harm to the community if reoffense occurs." AG Guidelines, Exhibit E. The example provided for high risk is where the "offender causes lasting or substantial physical damage to [the] victim, or offender uses or is armed with a weapon." Ibid. Although "[t]hese examples are in no way intended to be exclusive," they nevertheless reflect the Scale does not account for a sexual assault that resulted in the victim's murder.

While M.L.'s Scale score was properly computed, the judge nevertheless had the obligation to determine whether, given the individual facts of the case, the notification attendant to that tier was appropriate:

> The final determination of dangerousness lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. The ultimate decision on dangerousness is, therefore, a legal one, not a medical one, even though it is guided by medical expert testimony.
>
> [In re D.C., 146 N.J. 31, 59 (1996).]

Because Megan's Law was enacted to enable the public to protect itself against the dangers posed by sex offenders, the "level of notification required for the public to protect itself varies according to what crime the public must guard against." In re Registrant C.A., 146 N.J. at 102 (citing Doe v. Poritz, 142 N.J. 1, 73 (1994)). "The need for greater or lesser notification is directly related to the gravity of the offense to be re-committed along with the risk that the registrant will re-commit whatever crime the registrant committed before." Ibid. For this reason, we reject M.L.'s contention the State's application in this case was required to be supported by expert testimony. Here, the upward adjustment was not grounded in a reassessment of the level of risk based on a psychological evaluation, but on the type of harm at risk of being inflicted.

A-1008-22

We recognize that Megan's Law is intended to protect the public from recidivism of those convicted of sex offenses, and our Legislature has not enacted similar registration and notification requirements for other types of violent crimes. We note that here, in either of M.L.'s explanations for his motivation, his murder of R.C. was inextricably intertwined with his sexual assault of her. Our decision should not be construed to require Tier III notification in every case where a sexual assault resulted in the death of the victim. This determination must still be made on a case by case, fact-specific basis. Given our deferential standard of review and the particular facts of this case, we are satisfied the judge's decision here did not constitute an abuse of discretion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1008-22