722 A.2d 538 (1998)
317 N.J. Super. 379
In the Matter of REGISTRANT R.F.
Superior Court of New Jersey, Appellate Division.
Argued and Decided August 25, 1998.
Remanded November 17, 1998.
Briefs Submitted on Reconsideration December 7, 1998.
Decided December 28, 1998.
*539 Before Judges ANTELL and BILDER.
Remanded by the Supreme Court November 17, 1998.
The opinion of the court was delivered by ANTELL, P.J.A.D. (retired and temporarily assigned on recall).
By order dated July 2, 1998, pursuant to the Registration and Community Notification Law, N.J.S.A. 2C:7-1, et seq. ("Megan's Law"), the Law Division designated registrant a Tier II sex offender and directed notification of his presence in the community to twenty-five schools, agencies and community organizations in nine different municipalities. Registrant appealed therefrom, and on August 25, 1998, we summarily affirmed the Law Division's order of July 2, 1998 designating registrant as a Tier II offender, finding that determination to be supported by clear and convincing evidence. We summarily reversed the Law Division's order to the extent that it directed notification of registrant's presence to the specified schools, agencies and community organizations. We found that determination to be "unsupported by clear and convincing evidence or by any finding that children being cared for therein are likely to encounter registrant."
The State's petition for certification was granted on November 17, 1998 and the Supreme Court summarily remanded the matter to us "for reconsideration of the issue of the scope of notification in the light of respondent's history and personal circumstances detailed in the record in this matter."
Registrant is a thirty-one year old male with a history of behavior disorders going back to an early age. He was involved in alcohol and drug abuse during his teenage years, has been educationally classified as neurologically impaired and has been found to have a "significantly lower than normal intelligence."
At the age of fourteen, registrant was taken by his mother to a nearby Center for Mental Health following the discovery that registrant had been fondling the genitals of his three-year old female cousin. No formal charges were filed against registrant, but the incident led to a period of psychotherapy which resulted in only limited progress because of registrant's lack of interest and full participation.
In January, 1991, when registrant was twenty-three years old, the event occurred which led to his present classification as a sex offender. Registrant was then living with his paramour, D.Z., and her ten-year old son S.Z. On the night of January 26, D.Z. went out for the evening and left the boy in registrant's care. While S.Z. was lying on a couch watching television, registrant entered the room and reclined on another couch. Shortly after, the registrant left the room to change into his bathrobe and returned. S.Z. then left the room and also returned wearing a pair of shorts and a bathrobe. It was then that registrant took control over the youngster, masturbated him and subjected him to acts of fellatio and sodomy. According to registrant's Risk Assessment Score, the attack was carried out by "threats and minor physical force."
The matter was called to the attention of the authorities and sexual assault charges were filed against registrant. His subsequent examination by Dr. Mark Frank, a principal clinical psychologist at the Adult Diagnostic and Treatment Center, disclosed that he is not a compulsive offender. Dr. Frank found that "there is no clear indication that [R.F.] experiences a strong pedophilic sexual arousal pattern or that he struggles with irresistible urges to engage in such behavior." Based on this, he concluded that registrant's criminal behavior was not driven by a sexual compulsion.
*540 On May 8, 1992, registrant was sentenced to a term of eight years in the custody of the Department of Corrections with a parole ineligibility period of three years. He was credited with 377 days of jail time already served and served his detention at two separate correctional facilities. In connection with his application for parole in 1995 he was examined by Bruce Friedman, LCSW, Director of the Center for Mental Health, on March 21, 1996. That examiner opined that "factors that would indicate the existence of a sexual disorder were marginal."
In preparation for this Megan's Law proceeding, registrant was examined on June 22, 1998 by Dr. Paul Fulford, a licensed psychologist. Dr. Fulford's report observes that there is "no history of previous behaviors outside the family that would suggest a deviant arousal pattern or overall risk to the community. His main risk appears to be that of alcohol abuse." Dr. Fulford agreed that registrant was at moderate risk of reoffending, but that since "his risk is related to and triggered by the use of alcohol, which he is abstaining from, the need for community notification does not appear to be indicated." It is here relevant to note that according to his Risk Assessment Score, registrant's substance abuse is in remission.
His overall score of sixty-five places him in the upper range of moderate risk to reoffend.
Arguing in favor of notification, the prosecutor omits few details in acquainting us with registrant's sordid existence. It is not a pretty picture. On that canvas we see his contempt for authority, drug and alcohol abuse, sexual promiscuity, frequent arrests for fighting, for drug possession and for other forms of disorderly behavior. At the age of sixteen, he was the father of two out-of-wedlock children. After separating from the mother of those children, he married and fathered another child. The marriage was short lived and he took up thereafter with another woman, resulting in a third out-of-wedlock child. He is said to be neglectful of his duty to support these children.
Registrant's squalid life style and failure to conform to societal norms naturally excite one's punitive instincts. But the judicial process has already administered appropriate punishment to the registrant in a separate proceeding, and the constitutional justification for Megan's Law rests on the belief that it is intended as non-punitive, remedial legislation. E.B. v. Verniero, 119 F.3d 1077, 1097 (3d Cir.1997); Doe v. Poritz, 142 N.J. 1, 73, 662 A.2d 367 (1995). We work within a well-defined context in which standards of proof and procedure have been painstakingly formulated.
In this proceeding, it is the prosecutor's burden to prove by clear and convincing evidence not only the degree of risk created by registrant's presence in the community, but also the scope of notification necessary to protect the members of the community likely to encounter him.
Clear and convincing evidence is evidence upon which the trier of fact can rest "a firm belief or conviction as to the truth of the allegations sought to be established." Matter of Purrazzella, 134 N.J. 228, 240, 633 A.2d 507 (1993). It must be "so clear, direct and weighty and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Matter of Seaman, 133 N.J. 67, 74, 627 A.2d 106 (1993). The reasons for so high a standard of proof in Megan's Law proceedings were carefully stated in E.B. v. Verniero, supra, at 119 F.3d at 1110:
We have previously identified the private and public interests at stake in a Megan's Law proceeding. For present purposes, it is important to add that the impact of an erroneous determination on those interests is significantly dissimilar. An erroneous underestimation of an individual's dangerousness will not necessarily result in harm to protected groups. Registration alone, which Megan's Law mandates regardless of an offender's classification, allows law enforcement officials to monitor offenders and provides considerable disincentive to offenders to commit criminal acts because of the high likelihood of being apprehended. On the other hand, an overestimation of an individual's dangerousness will lead to immediate and irreparable harm to the offender: his conviction becomes *541 public, he is officially recorded as being a danger to the community, and the veil of relative anonymity behind which he might have existed disappears.
Having noted the pertinent considerations, the court then posed the following question and answer:
We must, therefore, ask whether the preponderance of evidence standard, which "allocates the risk of error nearly equally" between an erroneous overestimation or underestimation of a registrant's future dangerousness, "reflect[s] properly the [ ] relative severity" of these erroneous outcomes. Id. [Santosky v. Kramer, 455 U.S. 745] at 766, 102 S.Ct. [1388] at 1401 [71 L.Ed.2d 599 (1982)]. Addington [v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) ] supplies the answer. Because "the possible injury to the individual [registrant] is significantly greater than any possible harm to the state," the registrant, consistent with due process, cannot "be asked to share equally with society the risk of error." 441 U.S. at 427, 99 S.Ct. at 1809. It necessarily follows that the Due Process Clause requires that the state prove its case by clear and convincing evidence in a Megan's Law proceeding.
The holding in E.B. v. Verniero, supra, is summarized in the Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws (June 1998) (hereinafter "Guidelines") as follows:
Also upholding the constitutionality of the statute, the Third Circuit held that due process requires a standard of proof of clear and convincing evidence, with the burden of persuasion on the State for the purpose of determining the risk level of the offender, the geographic area within which notice is to occur and those to whom the notice will be provided. The Supreme Court of New Jersey incorporated these principles into the judicial review procedures. [at 2]
Accordingly, the Guidelines specify:
When it is determined that an offender falls within the TIER II category, then notification is to be provided to law enforcement agencies and such community organizations and educational institutions which, by reference to the definitions set forth in Section VI, are likely to encounter the offender. The decision as to which groups should appropriately be notified should be made on a case by case basis, following careful review. [ (Emphasis added) at 16].
At page 27 the Guidelines state:
Prosecutors should be prepared to set forth a factual basis for scope of notification by any means which will meet the burden of clear and convincing evidence that the area designated fulfills the requirement that these are the persons and institutions likely to encounter the offender.
The "likely to encounter" standard means that the community organization or members of the community "are in a location or in close geographic proximity to a location which the offender visits or can be presumed to visit on a regular basis." Guidelines at 12. In addition to geographic proximity the Guidelines also require that there be a "fair chance to encounter" the offender. Ibid. By this is meant that "the types of interaction which ordinarily occur at that location and other attendant circumstances demonstrate that contact with the offender is reasonably certain." Ibid. (emphasis added).
The late Chief Justice wrote the following about notification in Doe v. Poritz, 142 N.J. 1, 37, 662 A.2d 367 (1995):
The factor that will ordinarily be critical to a determination of "likely to encounter" is geographyhow close is the institution or organization, in the case of Tier Two notification, to the offender's residence or place of work or school. In some municipalities, not every institution or organization that would otherwise qualify for notification may be close enough to warrant same, but in some cases, as suggested above, institutions or organizations in other municipalities may be close enough. The same observations can be made for Tier Three notification. We do not attempt to define the area around the offender's residence or place of work or school that may be included within the *542 notification process, and assume it may differ from one locale to another. Depending upon the particular offender, factors other than geography may be considered if they are relevant to the offender's likely whereabouts, such as an offender's proclivity for certain locations, and geographic considerations may be affected by the nature of the offender's characteristics and the institution in question, e.g., a repetitive and compulsive pedophile and a large elementary school.
As the thought expressed in the last sentence of the foregoing excerpt suggests, the process of determining the proper scope of notification is further refined in an important way by having regard to the character of registrant's sexual offenses. Thus, the Supreme Court had this to say in I/M/O Registrant G.B., 147 N.J. 62, 83, 685 A.2d 1252 (1996): "In cases of incest-type offenders, for example, registrants may be able to show the normal Tier II or Tier III notification is inappropriate, given the intrafamilial nature of the offense."[1] In footnote 8 it wrote:
Even the State has recognized the legitimacy of narrowly tailoring notification in such circumstances. During a hearing in In re E.W., the transcript of which was made part of the record in this appeal, the State's expert, Dr. Witt, commented that the issue of incest, and the high scoring of incest offenders in the Scale deeply troubled the committee drafting the Scale. Dr. Witt testified that "[t]he solution we would have liked is that we would still rate them wherever they fall, but the notification could be more individually tailored to the particular registrant."
The Guidelines obviously have this thought in mind: "When determining the scope of notification, those members of the public to whom the offender is a risk should be considered. This must include reviewing the relationship between the offender and past victims." Guidelines at 18 (emphasis added). On the following page, the Guidelines furnish examples of instances when Tier II or Tier III notification may be properly tailored. They specifically state that if
"the offender's past victims are all members of the immediate family or same household, then it may be determined that the offender is not a risk to community organizations or schools which would otherwise receive notification concerning a Tier II offender."
The concept of "same household" is treated in the following way:
Members of the same household will include the children of any person living in the household in which the offender lives or where the offender has either full or part-time care or legal responsibilities. Members of the same household does not require a family relationship. The focus should be on the class of victims and the access to those victims, as well as the relationship of trust between victim and offender. Prosecutors should give careful consideration to whether the offender's acts were "predatory", in that the offender intentionally placed himself or herself in a household which included children in order to have an opportunity to offend.

[Guidelines 19-20 (emphasis added).]
Applying the foregoing principles to the facts of record, we find nothing to demonstrate clearly and convincingly that the attendees of the schools and community organizations that are within the scope of the notification provisions of the Law Division's order are reasonably certain to encounter registrant or that his presence in the community threatens them with a risk of his reoffending. Nowhere are we shown evidence that any of these agencies or organizations "are in a location or in close geographic proximity to a location which the offender visits or can be presumed to visit on a regular basis," (Guidelines at 11), a factor which the Supreme Court has termed "critical." Doe v. Poritz, supra, at 37, 662 A.2d 367.
Unable to show anything of record concerning the geographical relationship between the listed schools and agencies, the prosecutor suggests that such evidence is *543 unnecessary since the Law Division judge and trial counsel are all personally familiar with the relevant locations. The prosecutor adds that the Law Division judge "has essentially been taking judicial notice of these facts."
We reject the notion that the personal unrevealed knowledge of the judge and counsel can substitute for clear and convincing evidence as to material matters in dispute. If it were otherwise, the record would be impervious to review. Further, even if such vital matters could be the subject of judicial notice, our study of the transcript leaves no doubt that the right to take judicial notice was never exercised by the trial judge; nor was he ever requested to do so.
We find nothing in the registrant's history and personal circumstances that rises to the level of clear and convincing evidence that he threatens the children attending the listed schools. His two previous sex offenses, one in 1982, the other in 1991, while abhorrent, were committed upon two helpless children who in one way or another were placed in his care, were members of the same household as he and to whom he had easy and convenient access. His acts arose from a trusting relationship between him and his victims. They were not "predatory" in the sense of the Guidelines that he placed himself in a household which included these children in order to offend against them.
Nothing in the evidence suggests that he is given to prowling schoolyards or other areas serving children.
We agree with the prosecutor that the circumstances of these previous offenses give no assurance that he will not someday act out in a more aggressive way against someone outside his household or against someone older than his previous victims[2]. But this misconceives the test to be applied in fixing the scope of notification. It wrongly supposes that it is registrant's burden to prove that he is not a risk. As we have explained, the question is whether these previous offenses furnish clear and convincing evidence of a reasonable certainty that he is at moderate risk to attack young children in the vicinity of their schools and playgrounds.
We have not overlooked the prosecutor's extensive delineation of registrant's wanton character, his past bouts with alcohol and drugs, his successive unstable relationships with different women, and his financial irresponsibility toward the four children he has sired, mostly out-of-wedlock. But however disapproving we may be of this, no coherent explanation is given as to how it clearly and convincingly proves that he is likely to repeat his previous sexual offenses in the physical area covered by the Law Division's order.
We conclude that the proofs do not support the scope of notification directed by the Law Division's order of July 2, 1998.
Section VIIB of the Supreme Court's order of December 9, 1997 Amending its Procedure for Hearings on Objections to Megan's Law Tier 2 and Tier 3 Classification and Manner of Notification Determination provides:
B. Evidential Burden.
1. At the hearing, the prosecutor has the burden of persuasion by clear and convincing evidence as to both tier classification and manner of notification.
2. The judge's determination that the burden of persuasion has been met and justifies the proposed classification and the manner of proposed notification shall be supported by findings of fact and statement of reasons. See VIII below.
VIII
In all cases, the judge's final determination including those based on registrant's default, shall contain express findings of fact based on the standard of clear and convincing evidence that support the judge's conclusion that the State either has or has not met its burden of persuasion both as to tier classification and manner of notification; such findings shall also be specifically *544 included or expressly incorporated by reference in the final order.
Although the Law Division's order of July 2, 1998 satisfies the formality of reciting that the court determined by clear and convincing evidence that registrant's classification and the scope of the proposed notification are "proper", the judge's "determination" after the hearing and the order are devoid of findings. The prosecutor's brief speaks of the trial judge's "firm conviction" that community notification should be authorized, but nothing of the sort appears in the record. We find little more in the trial judge's brief decision than an unexplained reference to certain of the schools to which notification should be given. Furthermore, it makes no reference to the standard of clear and convincing evidence and contains no statement of reasons.
Absent findings, we may exercise our constitutionally authorized original jurisdiction and make our own findings. Farmingdale Realty Co. v. Borough of Farmingdale, 55 N.J. 103, 106, 259 A.2d 708 (1969); Esposito v. Esposito, 158 N.J.Super. 285, 291-92, 385 A.2d 1266 (App. Div.1978); Motor Club Fire & Cas. Co. v. New Jersey Mfrs. Ins. Co., 135 N.J.Super. 362, 367-68, 343 A.2d 473 (App. Div. 1975), aff'd 71 N.J. 352, 365 A.2d 195 (1976), rev'd other grounds after reh. 73 N.J. 425, 375 A.2d 639 (1977); R. 2:10-5. It is particularly appropriate that we do so in this case since the trial judge acted only on the basis of written reports, took no live testimony and no credibility issues were presented for resolution. We are at least as well positioned as the trial judge to decide the factual issues.
It is impossible to determine from the evidence presented that any of the community organizations, schools, day care centers, and agencies chosen by the prosecutor for notification are in a location, or in close geographic proximity to a location, which the offender visits or can be presumed to visit on a regular basis. Without such information, we cannot tailor the scope of notification to the needs of the situationeven if it were clear from the evidence that notification of any kind is necessary.
We do not infer from registrant's criminal history and personal circumstances that his sexual proclivities are such that the children in the care of the schools, agencies and community organizations chosen for notification are likely targets of attack by the registrant. The victims of his previous assaults were, for practical purposes, members of his household who had been left in his care, who were convenient and very vulnerable and whose relationship to registrant was based on trust. We do not infer that his presence in the same household was predatory in nature, i.e., accomplished by him in order to have an opportunity to offend upon the children.
In reaching our result, in addition to the nature of his previous offenses and the fact that he has been free of any encounters with law enforcement since his release from prison in 1995, we take into account the unrebutted opinions of the following behavioral experts: (1) Dr. Mark Frank, a principal clinical psychologist at the Adult Diagnostic & Testing Center who found "no clear indication that [registrant] experiences a strong pedophilic sexual arousal pattern or that he struggles with irresistible urges to engage in such behavior; (2) the evaluation report of Bruce Friedman, LCSW, Director of the Center for Mental Health, which stated that "factors that would indicate the existence of a sexual disorder were marginal"; (3) the report of Dr. Paul F. Fulford stating that while registrant poses a moderate risk to reoffend, there was "no history of previous behaviors outside the family that would suggest a deviant arousal pattern or overall risk to the community." Dr. Fulford added that since registrant's risk of reoffense is related to "the use of alcohol, which he is abstaining from, the need for community notification does not appear to be indicated." As we noted earlier, registrant's Risk Assessment Score shows that his use of drugs and alcohol is in remission and we have been shown no reason to believe otherwise.
We gather from the expert's reports that registrant's sexual misconduct was not of pathological origin and that he is able to control his behavior.
Our conclusion is that the prosecutor has not shown by clear and convincing *545 evidence that the children attending the schools and agencies and organizations specified in the Law Division's order are reasonably certain to encounter registrant. This determination was not rendered without appropriate deference to the Registrant Risk Assessment Scale. This is a useful tool, though "not a scientific device" to be rigidly followed in all cases. Matter of C.A., 146 N.J. 71, 108-109, 679 A.2d 1153 (1996); Matter of E.I., 300 N.J.Super. 519, 527, 693 A.2d 505 (App. Div. 1997). Thus, under the particular facts presented, especially where registrant's offense "occurred in the family home," Matter of Registrant G.B., 147 N.J. 62, 82, 685 A.2d 1252 (1996), we feel constrained to reach our stated result.
It is emphasized that our decision is not to be taken as an expression of confidence that registrant will not at some future time reoffend. A forecast such as that lies beyond our power to make and we are not called upon to do so. We decide only that under the constitutionally mandated standards which govern our determination, the asserted need for community notification has not been demonstrated.
The prosecutor asks that in the event we adhere to our earlier determination, we remand the matter to the Law Division with directions on how to proceed. This request misapprehends the role of a reviewing court. Registrant is entitled to a decision based upon the record below which the prosecutor had every opportunity to develop. We do not use our supervisory powers to guide the proceedings to a preferred result.
After careful reconsideration, we reaffirm our previous order of August 25, 1998 affirming so much of the Law Division's order as designates registrant a Tier 2 offender and reversing so much of that order as directs notification to the listed schools, community organizations and agencies. The matter is remanded to the Law Division for entry of an appropriate order.
NOTES
[1] Significantly, this opinion was written before E.B. v. Verniero, supra, shifted the burden of proof to require the State to prove registrant's tier designation and the need for notification by clear and convincing evidence.
[2] The prosecutor puts it this way: "[This court's previous decision] proceeds from the foolhardy hypothesis that because R.F.'s only known victims were children who were temporarily household or family members, and who were under age eleven, that it follows, like night the day, that he is unlikely to harm children or women, unless they are under age eleven and/or are living with him."