# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1841-23

IN THE MATTER OF THE
REGISTRATION OF K.M.

_____

Argued March 13, 2025 – Decided March 20, 2025

Before Judges Mawla and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. ML-21-01-0058.

Linda A. Shashoua, Attorney, Special Litigation Unit, argued the cause for appellant State of New Jersey (William Reynolds, Atlantic County Prosecutor, attorney; Courtney Cittadini, Section Chief, and Linda A. Shashoua, on the briefs).

Michael R. Noveck, Deputy Public Defender, argued the cause for respondent K.M. (Jennifer N. Sellitti, Public Defender, attorney; Michael R. Noveck, of counsel and on the brief).

PER CURIAM

The State appeals from a February 12, 2024 order, which classified respondent K.M. (registrant) as a Tier One offender under Megan's Law. We reverse and remand for the reasons expressed in this opinion.

In a prior appeal, registrant challenged an initial tier classification of Tier Two based upon a final Registrant Risk Assessment Scale (RRAS) score of fifty. In re Registrant K.M., No. A-3199-21 (App. Div. Feb. 6, 2023) (slip op. at 2). We remanded for the trial judge to undertake "a deeper inquiry into the facts." Id. at 9.

We found the record was "not clear regarding the role registrant played in achieving the penetration" of A.B., who was one of two minors transported across state lines for purposes of prostitution by registrant and his co-conspirator, C.C. Ibid. Although a federal jury had convicted registrant and C.C. of conspiracy to transport the minors, A.B. and her sister J.B., in interstate commerce to engage in prostitution, we and the trial judge recognized the conviction alone did not make registrant per se liable for penetration for RRAS scoring purposes. Id. at 2, 9.

We sought clarification regarding registrant's role as to A.B. "and how it relates to [registrant's] risk of re-offense." Id. at 9-10. This was because "[r]egistrant did not transport A.B. to New Jersey, room with her, or photograph

2

and create the advertisement leading to the penetration. According to the record, these tasks were undertaken by C.C. alone." Id. at 10.

We also noted there was no support for the trial judge's finding "registrant and C.C. 'frequently traveled together in the same vehicle and stayed at the same hotels.'" Ibid. The trial judge also assumed registrant and C.C. "'intended to share the profits from these activities' but we [found no] support for this assumption in the record." Ibid.

By way of background, registrant and C.C. met J.B. and A.B., then ages sixteen and fourteen, respectively, outside of their home in Pennsylvania. They exchanged phone numbers with the girls, and approximately two weeks later, C.C. drove to Pennsylvania to pick up both girls.

Once C.C. picked up the girls, he

> took them to a motel in Allentown, Pennsylvania where he introduced them to registrant. The following day, C.C. drove A.B. to Atlantic City and paid for her stay in a motel. C.C. told A.B.[] registrant "had driven J.B. to the Atlantic City area as well." C.C. then instructed A.B. on how to work as a prostitute, gave her a cellphone to use while working, "and directed her to communicate with him."
>
> . . . J.B. stated she and A.B. met registrant and C.C. in Allentown. C.C. then called J.B. at her home in Allentown and arranged to pick her and her sister up and take them to an Allentown motel. While at the motel, C.C. called registrant to meet them. Registrant

3

then transported J.B. to the Atlantic City area. Registrant and J.B. stayed in motel rooms in Egg Harbor and Absecon. Registrant instructed J.B. on how to work as a prostitute. When calls responding to a Craigslist advertisement placed by registrant began coming in, he informed J.B. and instructed her to have sex with the callers, but she refused and asked to be taken home. Instead of driving her home, registrant drove her to Philadelphia and left her there. Her father eventually picked her up.

[Id. at 2-3.]

In the federal trial, A.B. testified that at C.C.'s request she agreed to be photographed nude to appear in a Craigslist advertisement for prostitution. C.C. posted those photos and A.B. began receiving phone calls on the cellphone he had given her. A.B. answered a few phone calls and ultimately had oral sex on two occasions and charged $200 per occasion as instructed by C.C. A.B. was later arrested after undercover agents accessed her Craigslist post. C.C. was arrested on June 8, 2007, and registrant surrendered himself to authorities in Atlantic City soon after.

Following our remand, the State submitted additional evidence from registrant's federal jury trial, including: the trial transcript; a summary of registrant's two proffers; and evidence that C.C. admitted he and registrant recruited the two minor girls for prostitution. Registrant submitted a psychosexual evaluation "for the purpose of assessing whether the [trial c]ourt

4

should override [his] RRAS score because [registrant's] case 'falls outside the "heartland" of cases.'"

At the remand hearing, the judge reiterated "the State must show by clear and convincing evidence how . . . [registrant] has profited, or how he was involved in the penetration." She concluded the additional evidence submitted by the State did not carry its burden because the evidence registrant and C.C. had acted in tandem was presented the first time she heard the matter.

The State pointed out there was new evidence in the record showing C.C. reimbursed registrant for the costs he incurred for their enterprise. However, registrant's counsel pointed out the reimbursement pertained to J.B. and did not show "how he made money off of the penetration of A.B."

The judge found the record was not materially different and "does not shed light on how [registrant] participated in A.B.['s] . . . penetration and its relation to risk for re[-]offense." Indeed, "[r]egistrant did not transport A.B. to New Jersey, room with her, photograph, [or] create advertising leading to penetration. According to the record[,] these tasks were undertaken by C.C. alone." She concluded the State "failed to show [penetration] by clear and convincing evidence, based on the [a]ppellate remand."

A-1841-23

With respect to RRAS factor five, the "number of victims," the judge found, as she had initially, "there [were], in fact, two victims." Both registrant and C.C. were operating in tandem and "took [the girls] to a bar, . . . gave them [both] alcohol, . . . [and] prostitute[ed] these two girls" as "part of their conspiracy and . . . scheme." The judge kept factor five at a score of three.

Given her finding registrant did not participate in A.B.'s penetration, the judge modified factor two (degree of contact) from a score of fifteen to zero. The State agreed with the judge's reduction of factor seven (length of time since last offense) from a score of nine to three.

All the other scores the judge initially gave remained the same. Registrant's new RRAS score totaled twenty-nine, yielding a Tier One classification. Therefore, registrant would be subject to Megan's Law annual registration, but not community or internet notification.

I.

On appeal, the State challenges the judge's factor two findings. It argues she failed to recognize registrant as a co-producer of the penetration and misunderstood the concept of vicarious liability despite crediting the additional evidence provided on the remand. The State asserts the judge should have assigned a "high risk" score to factor two. It notes that we held a registrant's

6

RRAS score could be derived from a co-conspirator's actions where the registrant has been found vicariously liable. The State urges us to restore registrant's classification as a Tier Two offender.

The State alleges the judge exceeded the scope of the remand, which intended only to expand the record for evidence regarding the penetration because it was undisputed registrant was convicted of a conspiracy, which involved penetration. The goal of the conspiracy was achieved when it culminated in A.B. having oral sex for money. Registrant did not have to engage in the same conduct as C.C. to achieve the penetration.

The State asserts this case is unlike In re Registrant P.B., 427 N.J. Super. 176, 182-83 (App. Div. 2012), where we found no high risk of penetration on account of the registrant's possession of child pornography without evidence of the registrant's role in achieving the penetrative activity depicted therein. Here, registrant had a shared mental state and acted in furtherance of the conspiracy to achieve A.B.'s penetration. This was not an inchoate crime because registrant and C.C. expressly involved A.B. in their enterprise.

Notwithstanding registrant's direct participation in the conspiracy resulting in A.B.'s penetration, the State notes that evidence of direct penetration is not required for RRAS scoring purposes. It points out that in In re J.W., we

held "[a]n actor who provides criminal instruction need not be physically present . . . [and the penetration] include[d] . . . an instructed act of penetration of another." 410 N.J. Super. 125, 139 (App. Div. 2009).

The State points us to State v. Bridges, 133 N.J. 447, 468 (1993), which held vicarious liability does not require a shared mental state where the commission of the crime was foreseeable as a natural consequence of the conspiracy. Therefore, insulating registrant based on his conduct constituted a mistaken understanding of the law of vicarious liability and misconstrued the purpose of Megan's Law.

According to the State, the enhanced record following the remand only supports a finding registrant engaged in penetration. Indeed, C.C.'s confession confirmed registrant's role as a partner in the conspiracy. The evidence of this was the fact both men: shared money; had a shared modus operandi to engage in prostitution; coordinated their efforts; and had a shared consciousness of guilt.

The State claims registrant helped C.C. and expected financial remuneration. He admitted he was in the business of prostitution and knew C.C. was in the business of prostituting young females. Registrant instructed J.B. on how to work as a prostitute so he could "make money with her."

A-1841-23

The joint nature of the undertaking was demonstrated by the fact C.C. directed registrant to travel with J.B. to specific points and ultimately to a specific hotel. Although C.C. and A.B. traveled separately from registrant and J.B., they stopped at the same places, at the same time, and occasionally gathered as a group. The State asserts registrant and C.C. had a common design to have A.B. and J.B. dependent on them by isolating and maintaining distance between the girls.

Although the girls were kept separate, they were given the same instruction about how to work and how much to charge for oral and vaginal sex. Both girls had a cellphone to respond to Craigslist solicitations and both were told they would be receiving false identifications. Additionally, both girls were plied by registrant and C.C. with the same form alcohol and drugs.

The State argues registrant shared a consciousness of guilt with C.C. Once he learned of C.C.'s arrest, he destroyed evidence of the enterprise, including his cellphone and laptop, and altered the look of the automobile he used to travel with C.C.

The State urges us not to accord weight to the expert report registrant supplied on the remand because the record shows the risk of re-offense is high because registrant acted callously. It points out when J.B. refused to prostitute

herself, registrant abandoned her in Philadelphia, far away from her home. Moreover, the expert did not review the federal trial transcript and registrant's proffer, in which he stated he had been in the prostitution business for three years. The expert also opined without foundation that RRAS should not apply to human trafficking cases.

## II.

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re Registrant B.B., 472 N.J. Super. 612, 619 (App. Div. 2022). "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (internal quotations omitted) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "A trial court's interpretation of the law and the . . . consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

Megan's Law is intended "to protect the community from the dangers of recidivism by sexual offenders." In re Registrant C.A., 146 N.J. 71, 80 (1996); N.J.S.A. 2C:7-2(a). "The expressed purposes of the registration and notification

10

procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" Matter of A.A., 461 N.J. Super. 385, 394 (App. Div. 2019) (quoting N.J.S.A. 2C:7-1).  "The law is remedial and not intended to be punitive."  Ibid. (citing Doe v. Poritz, 142 N.J. 1, 12-13 (1995)).  The registration and notification laws are designed to give people a chance to protect themselves and their children. Poritz, 142 N.J. at 75.  In this regard, Megan's Law "should be construed broadly to achieve its goal of protecting the public."  State v. S.R., 175 N.J. 23, 36 (2002).   Under  New  Jersey's  Megan's  Law  jurisprudence,  "[s]tatutory interpretations leading to absurd or unreasonable results are to be avoided." G.H. v. Twp. of Galloway, 401 N.J. Super. 392, 409 (App. Div. 2008), aff'd o.b., 199 N.J. 135 (2009).

The scope of "community notification" under Megan's Law is determined by whether a registrant is a Tier One, Tier Two, or Tier Three offender.  B.B., 472 N.J. Super. at 619 (citing N.J.S.A. 2C:7-8(a), (c)(1) to (3)).  A registrant's tier designation indicates their risk of recidivism, as calculated by a court's consideration of the factors in the RRAS.  Ibid.  If a registrant's tier designation is Tier One, low risk, only "law enforcement agencies likely to encounter the person registered shall be notified."  N.J.S.A. 2C:7-8(c)(1).  For Tier Two,

11

moderate risk, "organizations in the community including schools, religious and youth organizations shall be notified." N.J.S.A. 2C:7-8(c)(2). And for Tier Three, high risk, "members of the public likely to encounter the person registered" are notified. N.J.S.A. 2C:7-8(c)(3).

The State has the burden to prove by clear and convincing evidence the risk to the community and the scope of notification necessary to protect the community. B.B., 472 N.J. Super. at 619. The evidence "must be 'so clear, direct and weighty and convincing as to enable . . . a judge . . . to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" In re J.G., 169 N.J. 304, 331 (2001) (quoting In re R.F., 317 N.J. Super. 379, 384 (App. Div. 1998)).

Further,

> even though the RRAS provides a useful guide for the prosecutors and court to evaluate risk of re-offense, the court must still make a value judgment in determining the proper tier classification and scope of community notification based on all of the evidence available to it. These determinations are best made on a case-by-case basis within the discretion of the court.
>
> [J.W., 410 N.J. Super. at 130 (citing C.A., 146 N.J. at 108-09).]

The State can rely on the RRAS "to establish its prima facie case considering a registrant's tier classification and manner of notification." C.A.,

146 N.J. at 110. In the end, however, it is the trial court's role to "make a value judgment in determining the proper tier classification and scope of community notification based on all the evidence available to it," based on "evidence that is clear and convincing." J.W., 410 N.J. Super. at 130.

According to the RRAS manual, factor two, "[d]egree of contact[,] is related to the seriousness of the potential harm to the community if re[-]offense occurs." Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws 5 (rev. Feb. 2007). The manual gives the following examples to assist in determining the level of risk: "Low risk example: fondles child victim over clothes; approaches adult victim on street and presses body against buttocks over clothing; exhibitionism or showing pornography to a child . . . . Moderate risk example: fondles under clothing . . . . High risk example: penetrates orifice with object, tongue, finger, or penis . . . ." Ibid.

In P.B., the registrant was convicted of third-degree child endangerment, N.J.S.A. 2C:24-4(a), after a police investigation determined he possessed depictions of child pornography on his computer. 427 N.J. Super. at 180. The State's RRAS showed a score of seventy-two, which placed P.B. on the high end

13

of Tier Two. Ibid. P.B. argued the RRAS did not apply because in viewing

photographs, he had no contact with the victims. Id. at 181. We

> reject[ed] the notion that the RRAS "high risk" standard
> of "penetration" in criterion [two], "degree of contact,"
> [was] satisfied by a showing that a registrant merely
> possessed depictions of penetrative sexual activity with
> children, without any concomitant indication that he
> played a role in the penetrative activity either as a
> participant or a producer.
>
> [Id. at 182-83 (emphasis added).]

We reversed the trial court's RRAS findings, concluding "that, under the very

terms of Megan's Law alone, the accused must have engaged in some kind of

participation in penetrative activity before [they] can be deemed to be

responsible for it on any level." Id. at 183.

Factor five, "[n]umber of offenses/victims[,] is related to the likelihood of

re[-]offense. A conviction is not necessary if the rater finds credible evidence

of multiple sexual offenses/victims." Attorney General Guidelines for Law

Enforcement for the Implementation of Sex Offender Registration and

Community Notification Laws at 5-6. However, this factor does not include

multiple incidents with one victim. Id. at 5-6. The manual gives the following

examples to assist in determining the level of risk: "Low risk example:

intrafamilial sexual abuse of one child (even if multiple incidents with the one

14

child); sexual assault of one adult stranger . . . . Moderate risk example:  two separate victims (even if only one incident with each victim or one incident involving both victims) . . . . High risk example:  three separate victims . . . ." Id. at 6.

We part ways with the conclusions drawn by the trial judge from the evidence presented by the State on remand.  The evidence adduced by the State on remand only pointed in the direction of registrant playing a role in A.B.'s penetration.

The trial transcript shows the jury found registrant conspired to transport both girls with the intent that they both engage in prostitution.  According to the jury verdict sheet, it found "the conspiracy involved the transportation of A.B. for purposes of prostitution."[1]  Registrant's proffers showed he had been in the prostitution business for three years and had worked with at least three other females.  He stated he knew C.C. and was friends with him for many years.  C.C. admitted registrant was a part of the prostitution scheme.

---

[1]  We recognize the verdict sheet was provided to us in the prior appeal. However, the trial transcripts provided on this appeal underscore the jury's finding specifically as to registrant's liability vis-à-vis A.B.; a fact that we did not highlight in our prior opinion.

A-1841-23

The judge's finding that the State failed to show registrant profited from the enterprise did not outweigh the clear and convincing nature of this evidence, including that because of C.C. and registrant's prostitution enterprise, A.B. was penetrated on two occasions. That A.B. and C.C. were arrested before the profits could be split had no bearing on the issue of registrant's role in the penetration.

Indeed, the judge's findings supported this conclusion when she stated:

> I see that the State has proven by clear and convincing evidence that there is, in fact, two victims. I do in fact agree that they acted in tandem. They had a plan . . . to keep the girls separate, because you've got to keep them vulnerable. You've got to keep them needing only them. They were sisters. They had to keep them apart. But the two of them knew what the plan was, and that they were going to go from this hotel to that hotel, and their plan was how they photographed the girl[s], and how they presented them.
>
> And then at one point they took them to a bar. They knew they were underage, and they both gave them alcohol. It was part of their conspiracy and their scheme to prostitute these two girls.
>
> [(emphasis added).]

We credit these findings for purposes of concluding registrant played a role in producing the penetration of A.B. because the additional evidence presented by the State only pointed in that direction. The purpose of our remand was for the State to present the judge with something other than the conspiracy

16

conviction because, as P.B. points out, there must be some evidence of the role a registrant played in the penetration. The State provided that evidence.

Although the judge conscientiously applied the facts to the law, we conclude her ruling was not supported by the evidence. The ruling also misapprehended the broader public safety and anti-recidivist goals of Megan's Law. Registrant readily admitted he had been in the prostitution "game" for years and victimized several females.

For these reasons, we are constrained to remand for a recalculation of registrant's RRAS score. Due to the passage of time, circumstances may have changed in a way that would affect the scoring, although we do not suggest this is the case. It suffices that for purposes of this appeal, we direct the judge to assign a high-risk score for the degree of contact. We do not reach the State's arguments regarding the probity of registrant's expert report because the judge did not rely upon it, and there is no cross-appeal challenging the fact she did not consider the report.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

17                                                A-1841-23