# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3465-23

IN THE MATTER OF
T.W.

_____

Submitted June 5, 2025 – Decided June 16, 2025

Before Judges Natali and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. ML-07-05-0078.

Lubiner, Schmidt & Palumbo, LLC, and Jeff Thakker, attorneys for appellant T.W. (Jeff Thakker, of counsel; Todd D. Palumbo, on the briefs).

Theodore N. Stephens II, Essex County Prosecutor, attorney for respondent State of New Jersey (Shep A. Gerszberg, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Registrant T.W.[1] appeals from a June 6, 2024 order classifying him as a

Tier II (moderate risk) sex offender subject to Tier III (high risk) notification

---

[1] We use initials to preserve the confidentiality of records related to child victims of sexual assault or abuse. R. 1:38-3(c)(9).

pursuant to the registration and community notification provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23. We affirm.

The State alleges T.W. has an extensive history of criminal sexual conduct dating back to the mid-1980s. He previously held positions as a boys baseball coach, junior high and high school teacher, and professor at a community college, and used those positions of authority and trust to gain access to young, male victims.

In 2013, M.D., who was born in October 1975, reported to law enforcement in Georgia, where he lived at the time, that T.W. befriended his family when he was a child in Hawthorne, and groomed him by giving him gifts. T.W. performed oral sex on M.D. and engaged in sexual contact with him when M.D. was ten to sixteen or seventeen years old, from 1985 through 1991. T.W. admits he "had sex with" M.D. "[i]n the 1980s," but contends M.D. "was [sixteen], being the legal age of consent for sexual activity."

On February 11, 2013, law enforcement received a report from Paterson school officials regarding T.W., who was then a high school teacher, engaging in inappropriate contact with two students. M.G., who was then seventeen years old, reported T.W. would stop him in the school hallway, offer him candy and money in exchange for his phone number, and asked him to go to dinner.

2

On February 8, 2013, T.W. sent M.G. a message saying he "remind[ed] him] of some Dominican children that when [T.W. would] go to the Dominican Republic and for money they put something sweet in their throat and . . . it hurt[] them." In another message, T.W. said he wanted to perform oral sex on M.G. for fifty dollars. On February 23, 2013, T.W. sent M.G. a message arranging to meet him at a fast food restaurant that evening. T.W. was arrested in his car while waiting to meet M.G.

D.L., who was nineteen years old, reported T.W. would give him money and repeatedly gave him his personal phone number. On February 8, 2013, T.W. sent him a message stating he "want[ed D.L.] and [his] milk for [forty dollars]."

A subsequent police investigation revealed additional child victims. In 2013, E.T. was sixteen years old. T.W. was previously his seventh-grade teacher. On February 16, 2013, T.W. saw E.T. on Pennington Street in Paterson and stopped him. After they exchanged phone numbers, T.W. handed him forty-five dollars and said he knew they could "have a great relationship." T.W. texted E.T. later that he "looked great, . . . but [he] still d[id not] have [E.T.'s] c[**]k in [his] throat." T.W. offered forty dollars to perform oral sex on E.T.

W.C. was thirteen years old in 2013. T.W. was previously his seventh-grade teacher. On February 10, 2013, T.W. saw W.C. on Market Street in

Paterson and stopped him. At the end of their conversation, T.W. gave him five dollars and squeezed W.C.'s buttocks. T.W. later sent W.C. messages offering money if W.C. would send him shirtless pictures and allow T.W. to perform oral sex on him. T.W. told W.C. he would "suck [him] all day."

J.C. was fifteen years old in 2013. T.W. was previously his seventh-grade teacher. In 2011, he encountered T.W. while on winter break. T.W. told him he looked good and that "if [J.C.] liked [twenties] in his pockets[,] then he had to keep seeing him." They met several times. On one occasion, T.W. offered J.C. twenty dollars to "go out to eat and hang out with him at his home." T.W. drove J.C. to his apartment, where T.W. "went into the kitchen to take off his pants" and told J.C. to sit down and relax. While they were sitting on a couch watching television, T.W. began to massage J.C.'s shoulder. J.C. left the apartment.

On September 17, 2013, T.W. was indicted for: first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b) and 2C:14-2(c)(4); second-degree luring or enticing a child, N.J.S.A. 2C:13-6; second-degree endangering the welfare of child by a caretaker, N.J.S.A. 2C:24-4(a); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); second-degree attempted sexual assault,

N.J.S.A. 2C:5-1 and 2C:14-2(c)(3)(b); second-degree attempted endangering the welfare of a child, N.J.S.A. 2C:5-1 and 2C:24-4(a); four counts of second-degree promoting child prostitution, N.J.S.A. 2C:34-1(b)(3); four counts of third-degree compelling another to engage in prostitution, N.J.S.A. 2C:34-1(b)(5); and second-degree official misconduct, N.J.S.A. 2C:30-2A (the 2013 indictment). T.W. pleaded guilty to: third-degree attempted endangering the welfare of a child (M.G.), N.J.S.A. 2C:5-1 and 24-4(a)(1); third-degree endangering the welfare of a child (W.C.); and third-degree compelling another to engage in prostitution (E.T.), N.J.S.A. 2C:34-1(b)(5).

On December 7, 2018, T.W. was sentenced to three years to be served at the Adult Diagnostic and Treatment center for sex offenders (Avenel) following a determination that his criminal conduct was repetitive and compulsive in nature. His sentence included sexual offender registration and notification requirements pursuant to Megan's Law, and a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4. He was ordered to surrender his New Jersey teaching license and "not have any unsupervised contact with anyone under the age of [eighteen] years old."

T.W. was previously charged with similar offenses on two occasions. In September 2003, he was charged with criminal sexual contact and endangering

the welfare of a child after C.S., age fourteen, reported T.W., who was a teacher at his middle school in Paterson, touched him inappropriately at school and while giving him a ride to a Little League baseball game in his car. C.S. alleged T.W. told him he loved him and wanted to do things to him he had never done with anybody else. C.S.'s mother did not want to pursue the charges, and a grand jury declined to indict him.

On July 29, 2004, T.W. was indicted for criminal sexual contact upon J.M., who was a student of T.W.'s at a local community college. J.M. alleged T.W. invited him to his home in Paterson, where he played a pornographic video and gave him a beer. T.W. put his hand on J.M.'s leg, rubbed his back, and asked J.M.'s nationality. When he learned J.M. was from the Dominican Republic, T.W. asked, "is it true that Dominicans have big d[***]s?" On May 17, 2005, T.W. was found not guilty by a jury.

In a report dated April 7, 2020, Avenel determined "[a] review of [T.W.'s] sexual recidivism risk factors, using the Static-99R, an actuarial assessment tool, yielded a score of +[five], estimating his risk to sexually reoffend to be in the '[a]bove-[a]verage' risk category." The report noted T.W. "hesitates to link his sexually deviant behavior with all of his victims, students, and adult stranger[s] he has had indiscrimina[te] sex with, both locally and during his travels to the

Dominican Republic." Avenel "strongly recommended" that after his release, T.W. "be involved in ongoing structured sex offender aftercare in a group setting, attend therapy to address sexual identity-related issues, and have no unsupervised contact with minors on the internet or in person."

On September 7, 2020, T.W. was released from Avenel. Since his release, T.W. has resided at a shelter in Newark. His former parole officer, SPO Luis Carmenate, reported T.W. "is engaging in sexual conduct with other residents, sometimes for money, mirroring his offense conduct." SPO Carmenate also reported he "discovered multiple text messages with individuals [T.W.] calls 'friends' about meeting up with them to perform fellatio and 'lend' them money in ranges of [thirty-five] to [forty] dollars at a time." T.W. "is also very active on dating sites such as [Grindr] and Jack'd . . . indicat[ing] a hypersexuality that is associated with re-offending."

The State contended, despite the Avenel report recommendation, T.W. was not participating in structured sex offender aftercare or therapy. He completed one sex offender specific counseling program in 2022, and "has attended no other therapies or programs."

On September 22, 2023, the State filed a motion to classify T.W. "as a Tier [Three]-Internet, High Risk Sex Offender pursuant to" Megan's Law. The

State initially scored T.W. on the Registrant Risk Assessment Scale (RRAS) at seventy-eight points. The State contended "regardless of his final RRAS score, [T.W.] should be designated tier [three] - high risk."

It argued:

> [T.W.] has shown a cunning ability, over many years, to groom not just victims[,] but families and classmates, sports teams[,] and co-workers. He created environments in which the victims knew everyone liked [him], and such that they would not likely be believed if they disclosed his abuse. . . . [I]n stunning breaches of trust, he used positions of authority as a sports coach and teacher to gain access to vulnerable inner-city schoolboys, whom he peppered with money[,] . . . with promises of more, just as he did as a sex tourist in the Dominican Republic.

> [T.W.] has been employed, among other things, as an accountant, a boys baseball coach, a junior high and high school teacher in Paterson[,] . . . and a professor at . . . [a c]ommunity [c]ollege. He has used all these positions of authority and trust to gain easy access to young, vulnerable male victims. It is not possible to accurately count the number of victims of [T.W.'s] seemingly relentless grooming activity.

The court heard three days of hearings on December 12, 2023, February 29, 2024, and March 26, 2024. Over the course of those hearings, the State agreed to certain adjustments to the RRAS score. Specifically, it agreed to reduce the score for category thirteen, employment/educational stability, from three to zero because T.W. is retired, and the score for category twelve,

residential support, was reduced from three to one because T.W. was having difficulty finding a place to live outside the shelter. This resulted in a final score of seventy-three, one point below Tier III notification. The State argued for a "heartland" increase to Tier III notification because "the RRAS does not properly encapsulate [T.W.'s] risk."

On June 5, 2024, the court granted the State's motion supported by an oral opinion and entered a conforming order on June 6. It designated T.W. as "Tier [Two], with Tier [Three] High Level Notification" based on a final RRAS score of seventy three. The court found:

> [T]here was a repetitive and compulsive finding here based on the Avenel report dated September 18[,] . . . 2018, which would require registration every [ninety] days, quarterly . . . .
>
> The records that [the court] . . . reviewed do indicate a fairly extensive history dating back to the middle eighties. . . . Here in 2003, criminal sexual contact and endangering the welfare of a child. There were additionally some admissions about international travel in which [T.W.] admitted to sexual contact. . . .
>
> There were five victims ranging from ages [thirteen] to [nineteen]. He was released in 2020. There was a Static[-]99R score of plus five, which is above[-]average risk to sexually reoffend. He[ is] within a short timeframe, within five years when . . . statistically proven odds of sexual re-offense are at the highest.

In the various categories[,] he has a previous history of employment that had exposed him to younger victims. There were multiple victims. Noting in category one, a score of five, threats and minor physical force, requests by [T.W.] not to tell anybody, monetary and gift[-]type rewards for silence.

The court then reviewed each of the RRAS categories and determined the State's final scoring of seventy-three was adequately supported by the record. It found T.W.'s final score of seventy-three,

> would be Tier II with [i]nternet. So[,] what remains for the [c]ourt is to determine whether or not Tier III notification is appropriate here.
>
> . . . In reviewing all of this record documentation, [T.W.] has a history of deliberately placing himself in situations where he has access to additional victims or potential victims. His current situation does nothing to disabuse the [c]ourt of a finding that that pattern continues to this day.
>
> There is clear and convincing evidence in the record that he refuses to leave the shelter. And, again, that[ is] a choice that he makes, but it provides him access to victims.
>
> Now, there are multiple text exchanges that were seen by [law enforcement], although it[ is] not illegal for him to be on [i]nternet sites. What concerns the [c]ourt most is the Static[-]99[R] scoring upon his release. A plus five is . . . significant on that score for risk of re-offense.
>
> That fact[] . . . [is] a significant factor in [its] determination that the people with whom he lives in

10

that shelter who . . . potentially may be new people to that shelter on a frequent basis, should have knowledge. [The court] do[es] find that only Tier III notification is going to achieve the goal in light of the proclivities, as [the court has] outlined them here. Tier II notification would not achieve that objective.

Therefore, even though the score is [seventy-three], [the court is] clearly convinced that Tier III notification is appropriate for the reasons that [it has] stated. . . .

On July 19, the court entered an order staying "the Tier [three] scope of notification" pending appeal. On appeal, T.W. contends: (1) the court's "upward departure from the 'heartland' was erroneous as a matter of law"; (2) in granting the upward departure the court did not rely on "reasons that are[ not] already fairly encompassed in the RRAS scoring" and double-counted certain factors; and (3) "factual disputes regarding the RRAS or any proposed 'upward heartland departure' should be resolved via an evidentiary hearing."

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re Registrant B.B., 472 N.J. Super. 612, 619 (App. Div. 2022) (citing In re Registrant A.I., 303 N.J. Super. 105, 114 (App. Div. 1997)). "[A]n abuse of discretion arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an

11

impermissible basis." Id. at 619-20 (alteration in original) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)). "The trial court's findings will be upheld so long as they are supported by sufficient evidence in the record . . . ." In re Registrant M.L., 479 N.J. Super. 433, 449 (App. Div. 2024). However, "[a] trial court's interpretation of the law and the . . . consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The "hearing process . . . is not governed by the [R]ules of [E]vidence." In re Registrant C.A., 146 N.J. 71, 83 (1996). When calculating a registrant's score on the RRAS, "the State is free to rely on hearsay statements to support its assertions and does not need to base its calculations surrounding the underlying offense solely on the facts of conviction." In re Registrant G.B., 147 N.J. 62, 79 (1996) (citing C.A., 146 N.J. at 88-93). The court may consider "all reliable information" including "[s]exual offenses, not the subject of a conviction" and supported by admissions, police reports, and psychiatric reports. In re Registrant J.W., 410 N.J. Super. 125, 130-31 (App. Div. 2009).

Megan's Law is intended "to protect the community from the dangers of recidivism by sexual offenders." C.A., 146 N.J. at 80 (citing N.J.S.A. 2C:7-1(a)). In fact, "[t]he expressed purposes of the registration and notification

12

procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" In re Registrant A.A., 461 N.J. Super. 385, 394 (App. Div. 2019) (quoting N.J.S.A. 2C:7-1). "The law is remedial and not intended to be punitive." Ibid. (citing Doe v. Poritz, 142 N.J. 1, 12-13 (1995)).

The extent of community notification chiefly results from a registrant's designation as a Tier I (low), Tier II (moderate), or Tier III (high) offender. N.J.S.A. 2C:7-8(a), (c)(1) to (3). Tier designations reflect a registrant's risk of re-offense. A.A., 461 N.J. Super. at 402. If the risk of re-offense is deemed low, only law enforcement agencies likely to encounter the registrant are notified. N.J.S.A. 2C:7-8(c)(1). If the risk of re-offense is considered moderate, schools and community organizations in the community also must be notified. N.J.S.A. 2C:7-8(c)(2). But if the risk of re-offense is high, members of the public likely to encounter the registrant likewise must be notified. N.J.S.A. 2C:7-8(c)(3).

Given the need for uniformity, N.J.S.A. 2C:7-8(a) authorized the Attorney General to create guidelines and procedures to evaluate a registrant's risk of re-offense. See Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification

Laws (rev'd Feb. 2007) (Guidelines). The RRAS was developed for the State's use to establish a registrant's tier classification and manner of notification. In re Registrant T.T., 188 N.J. 321, 328 (2006) (citing C.A., 146 N.J. at 110).

The Megan's Law "[t]ier designations reflect a registrant's risk of re-offense, as determined by a judge assessing various information, including thirteen factors referenced in the RRAS." In re Registrant C.J., 474 N.J. Super. 97, 106 (App. Div. 2022) (citing A.A., 461 N.J. Super. at 402). "Although it is not scientific evidence, the [RRAS] is a 'reliable and useful tool that the State can use to establish its prima facie case concerning a registrant's tier classification and manner of notification.'" M.L., 479 N.J. Super. at 443 (quoting C.A., 146 N.J. at 110).

"While a tier classification made on the basis of the [RRAS] should be afforded deference, it is not absolute; a Megan's Law judge must conduct an independent review of the merits of the case and not rely solely on the [RRAS] score." Ibid. (citing C.A., 146 N.J. at 108-09). The State ultimately bears the burden of proving "by clear and convincing evidence both the registrant's level of risk to the community and the scope of notification necessary to protect the community." Ibid. (citing In re Registrant R.F., 317 N.J. Super. 379, 383-84 (App. Div. 1998)). The evidence "must be 'so clear, direct and weighty and

14

convincing as to enable . . . a judge . . . to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" In re Registrant J.G., 169 N.J. 304, 331 (2001) (quoting R.F., 317 N.J. Super. at 384).

The RRAS contains four categories:  seriousness of the offense; offense history; personal characteristics; and community support.  State v. C.W., 449 N.J. Super. 231, 260 (App. Div. 2017) (citing In re Registrant V.L., 441 N.J. Super. 425, 429 (App. Div. 2015)).  Within those categories is a non-exhaustive list of thirteen risk assessment criteria related to re-offense.  C.A., 146 N.J. at 82.

"The first two categories, '[s]eriousness of [o]ffense' and '[o]ffense [h]istory,' are considered static categories because they relate to the registrant's prior criminal conduct."  Id. at 103.  The next two categories, "[c]haracteristics of '[o]ffender' and '[c]ommunity [s]upport' are considered to be dynamic categories, because they are evidenced by current conditions."  Ibid.  The "static factors" relate to past criminal conduct and weigh more heavily under the RRAS than the dynamic factors.  In re Registrant J.M., 167 N.J. 490, 500 (2001).

The "[s]eriousness of [o]ffense" category takes into account:  (1) degree of force; (2) degree of contact; and (3) age of the victim(s).  C.A., 146 N.J. at 103. The "[o]ffense [h]istory" category covers:  (4) victim selection; (5) number

of offenses/victims; (6) duration of offensive behavior; (7) length of time since last offense; and (8) any history of anti-social acts. Ibid. The "[c]haracteristics of [o]ffender" category accounts for the registrant's: (9) response to treatment and (10) substance abuse. Id. at 103-04. The final category, "[c]ommunity [s]upport" considers a registrant's: (11) therapeutic support; (12) residential support; and (13) employment/educational stability. Id. at 104.

"Each factor is assigned a risk level of low (0), moderate (1), or high (3), and '[t]he total for all levels within a category provides a score that is then weighted based on the particular category.'" A.A., 461 N.J. Super. at 402 (alteration in original) (emphasis omitted) (quoting C.A., 146 N.J. at 104). "An RRAS score [totaling] 0 to 36 is low risk; 37 to 73 moderate risk; and 74 or more, high risk." T.T., 188 N.J. at 329 (citing Guidelines 4).

Atypical cases in which the RRAS score is rendered suspect due to unique facts require an adjustment of the level of community notification indicated; this situation is commonly referred to as falling outside the "heartland" of Megan's Law cases. G.B., 147 N.J. at 82. "[T]he State may, in limited circumstances, request notification more expansive than indicated by a registrant's confirmed [RRAS] score." M.L., 479 N.J. Super. at 449. Such a request may only be made "in the 'unusual case where relevant, material, and reliable facts exist for which

16

the [RRAS] does not account, or does not adequately account. . . . Those facts must be sufficiently unusual to establish that a particular registrant's case falls outside the 'heartland' of cases." Ibid. (omission in original) (quoting G.B., 147 N.J. at 82).

"In challenging a tier determination, a registrant may argue that (1) the RRAS score was erroneously calculated, (2) the case falls outside the 'heartland' of Megan's Law cases, or (3) the extent of community notification required is excessive due to 'unique' aspects of the registrant's case." In re Registrant J.G., 463 N.J. Super. 263, 275 (App. Div. 2020) (quoting T.T., 188 N.J. at 330).

Having considered the arguments raised on appeal, we affirm substantially for the reasons set forth in the court's oral opinion. We add the following comments.

We are not persuaded by T.W.'s argument the court's order requiring notification more expansive than that indicated by T.W.'s confirmed RRAS score is inconsistent with New Jersey Supreme Court precedent. We recently considered and rejected this same argument in M.L. We are convinced M.L. was correctly decided and see no reason to depart from its thorough and well-reasoned analysis.

We are satisfied the court appropriately exercised its discretion by ordering Tier III notification based on the unique facts of this case. T.W. has a proven decades-long history of sexually assaulting young, vulnerable male children. This history includes numerous confirmed acts of sexual assault and attempted sexual assault, as well as credible allegations of additional acts on trips outside of the United States. As the State contends, there is no way to reliably estimate the total number of T.W.'s victims.

The court appropriately found T.W.'s Static-99R score indicates above-average risk of re-offense, and evidence in the record establishes he continues to engage in conduct indicating a hypersexuality that is associated with re-offending. This includes evidence of text messages with individuals offering them money in exchange for sex. In addition, the RRAS does not adequately account for T.W.'s unusual status as a retired individual living in a shelter with access to potential victims, many of whom are transient and vulnerable. The court's decision was based on "material[] and reliable facts" that are "sufficiently unusual to establish [T.W.'s] case falls outside the 'heartland' of cases." See M.L., 479 N.J. at 449-50. We do not discern any basis to disturb the court's findings.

We are not convinced by T.W.'s claim the court "double counted" the RRAS factors. Rather than "double counting," by discussing the various factors the court was properly considering whether the RRAS "adequately accounted" for the unique facts of T.W.'s case. See ibid.

T.W.'s claim there are disputed issues of fact requiring an evidentiary hearing lacks merit. The court conducted three days of hearings on the State's motion at which T.W. had the opportunity to present any additional evidence he believed the court should have considered in connection with purported factual disputes. He elected not to do so.

Moreover, his claim there is a factual dispute over M.D.'s age when he "had sex" with him "[i]n the 1980s" is belied by the record. M.D. was born in 1975 and did not turn sixteen until October 1991. He was significantly younger than sixteen "[i]n the 1980s." T.W.'s claim he was "never charged" with sexually assaulting M.D. is incorrect. Counts fourteen through seventeen of the 2013 indictment charged T.W. with sexual assault and sexual contact upon M.D. when he was less than sixteen years of age. Those counts were later dismissed pursuant to T.W.'s plea agreement.

T.W.'s argument the "court considered unsubstantiated third-party hearsay" regarding his "illicit sexual relations in the Dominican Republic and

paying for sex in the shelter" is not persuasive. Those allegations are adequately supported by numerous witness statements and other evidence in the record. In a classification hearing, the court is free to consider all reliable evidence. It was not an abuse of discretion for the court to make findings based on the witness statements, police reports, and other reliable evidence in the record.

Given our deferential standard of review and the unique facts of this case, we are persuaded the court's decision did not constitute an abuse of discretion. The court thoroughly reviewed the evidence and legal arguments and found the State established by clear and convincing evidence T.W.'s RRAS score of seventy-three, and that an expansion of the notification requirements to Tier III is warranted based on the facts of this case.

To the extent we have not addressed any of T.W.'s remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

20

A-3465-23